COMMONWEALTH of Pennsylvania,
Appellee

v.

Kenneth DONALDSON, Appellant.

Superior Court of Pennsylvania.

Submitted May 22, 2001.
Filed Nov. 13, 2001.

Glenn M. Goodge, Allentown, for appellant.

James B. Martin, Allentown, Assistant District Attorney, for Com., appellee.

Before: FORD ELLIOTT, BROSKY and BECK, JJ.

BROSKY, J.

¶ 1 This is an appeal from a judgment of sentence [1] imposed upon Appellant after he was convicted of possession of a controlled substance, namely, heroin. Appellant raises a single issue, whether the court erred in failing to suppress the drugs and other paraphernalia seized from Appellant? We vacate and remand.

¶ 2 As a preface to our analysis we set forth the trial court's recitation of the facts of the case:

On the afternoon of January 18, 2000, Officer Gail Schaffer of the Allentown Police Department Vice and Intelligence Unit was conducting surveillance for drug activity in the 400 block of North Fourth Street in Allentown. This area is known to be an area of extremely high drug activity. At approximately 3:20 p.m., Officer Schaffer observed a green and cream colored pickup truck drive slowly through the block where she was positioned. She observed the driver of the pickup, Defendant Kenneth Donaldson, repeatedly looking back and forth as he drove through the block. She then observed Defendant drive out of the block and out of her sight. Moments later, appearing to have completed a circle of the block, Defendant drove his truck slowly down the block again, this time stopping his pickup near a Hispanic male who Officer Schaffer had noticed loitering near the corner of Mohr and Allen Streets. After a brief conversation with Defendant, the Hispanic male entered the passenger side of defendant's pickup.

Officer Schaffer followed the pickup as it drove to a large apartment building located at 401 North Gordon Street, an address familiar to Allentown vice officers because it has been the subject of numerous recent complaints of drug activity.

When Defendant's pickup stopped in front of 401 North Gordon Street, the Hispanic male passenger exited the truck, entered 401 North Gordon, and exited moments later accompanied by a second Hispanic male. The first Hispanic male re-entered the pick up, while the second Hispanic male went to the driver's side window of the pickup, spoke briefly with the Defendant, and then returned to the apartment building while Defendant drove away. A short distance later, Defendant now located at 4th and Allen Street, stopped his pickup, the first Hispanic male passenger exited, and Defendant drove away.

Believing she had just witnessed a drug transaction between Defendant and the second Hispanic male (with the first Hispanic male acting as a go between), Office (sic) Schaffer radioed to the Police communications center and requested that a marked police vehicle stop Defendant's pickup truck.

Minutes later, Defendant's pickup was stopped by a marked vehicle in the 400 block of Court Street. Officer Schaffer and Officer Donald French approached Defendant's truck—without weapons drawn—and asked Defendant to step out of his vehicle. After Defendant exit-

1. Although Appellant had identified his appeal as lying from the order denying his suppression motion, the appeal properly lies from the judgement of sentence imposed after his conviction. *See Commonwealth v. Buck*, 422 Pa.Super. 121, 618 A.2d 1047 (1993), *Commonwealth v. Dorman*, 272 Pa.Super. 149, 414 A.2d 713 (1979).

ed his truck, Officer Schaffer gave Defendant his Miranda warnings and then asked Defendant for his identification. Following this, Officer Schaffer asked Defendant where he was coming from. Defendant responded by claiming he was coming home from work and by denying that he had stopped anywhere in transit. Because Defendant's story conflicted with her own observations, Officer Schaffer accused Defendant of lying.

As Defendant began to further explain himself, Officer Schaffer observed that Defendant was having trouble speaking because he had something in his mouth. She asked Defendant to spit the item out of his mouth. To this request Defendant refused and then attempted to swallow the item that had been troubling his speech. In order to remove the item from Defendant's mouth before he could swallow it, Officer Schaffer grabbed the Defendant by the throat. Her tactic succeeded and Defendant spit out a clear packet containing a white powder that appeared to the officer to be heroin. Defendant was immediately placed under arrest and handcuffed.

Following his arrest, Defendant admitted to the officers that he had purchased the heroin from the second Hispanic male and that his passenger had arranged the purchase. At this time Defendant also gave police consent to search his truck. Upon exercising this search, Officer Donald French found two syringes located under the seat of Defendant's pickup truck. The white powder which was found on the syringes later field-tested positive for heroin.

As a result of this stop and the search, Defendant was charged with one count of Possession of a controlled substance.

Trial Ct. Op., at 1–4.

¶ 3 In response to the filing of drug possession charges against him, Appellant filed an omnibus pre-trial motion seeking suppression of the heroin forcibly removed from his mouth as well as the syringes later found in his vehicle. A hearing was held on Appellant's motion on June 21, 2000, after which, Appellant's motion was denied causing him to proceed to a non-jury trial on September 19, 2000. Following the non-jury trial, Appellant was convicted of one count of possession of a controlled substance. After sentencing, Appellant took the instant appeal.

¶ 4 In denying Appellant's motion to suppress the trial court reasoned that the initial stop of Appellant was an investigative detention that was supported by "reasonable suspicion." Subsequently, there then occurred an escalation of events so that probable cause existed to make an arrest by the time a packet of heroin was forcibly removed from Appellant's mouth. We respectfully disagree.

¶ 5 It is well established that contact between the police and the citizenry fall within three general classifications, mere encounter, investigative detention and custodial detention or arrest. *See* *Commonwealth v. Strickler*, 563 Pa. 47, 757 A.2d 884 (2000). While on the one hand a traffic stop is deemed a "seizure" within the realm of search and seizure law, it may constitute only an "investigative detention" for purposes of the three classifications set forth above, *Commonwealth v. Sadvari*, 561 Pa. 588, 752 A.2d 393 (2000), thereby requiring only "reasonable suspicion" for its validity. While the term "reasonable suspicion" is undoubtedly open to some degree of interpretation, it would seem clear that it was meant to convey a level of suspicion that goes beyond an "educated hunch." We find the very recent decision of this Court in *Commonwealth v. Carter*, 779 A.2d 591 (Pa.Super.2001), in-

structive as well as analogous to the present case. The panel set forth the relevant facts as follows:

On February 22, 1997, Officer Patrick Kinavey, a City of Pittsburgh police officer, was performing his general patrol duties in the Hazelwood section of Pittsburgh, a known high drug and crime area. At approximately 3:25 P.M., he observed Appellee on Flowers Avenue walking towards a pickup truck parked on the street. Appellee began conversing with the two occupants of the truck. The officer observed him placing his left hand in his jacket pocket and start to remove that hand. Appellee appeared to look in the direction of the marked cruiser being operated by Officer Kinavey. He then mouthed the word "popo" (meaning police). The officer pulled his vehicle in front of the truck and as he drove by, he recognized one of the occupants of the truck as a self-described heroin user. Appellee then started walking away from the truck and the officer turned and began to follow him. When he came close to Appellee, the officer parked his vehicle, got out of the vehicle and asked Appellee if he could speak with him. Appellee responded, "what's up?" The officer again asked Appellee if he could speak with him.

*Id.*, at 592. After the officer engaged appellee in conversation, the encounter escalated into a circumstance where the appellee was ordered to remove his hands from his pocket revealing a plastic bag containing packages of heroin. In determining the legality of the seizure, ultimately the Panel's analysis turned to the matter of reasonable suspicion to make the initial stop. Upon consideration of that factual scenario the Panel reached the following conclusion:

With regard to the officer's observation of Appellee's interaction with the occu-pants of the vehicle, such observation could not have given rise to a reasonable suspicion that Appellee was engaged in criminal activity.

After recapping the officer's observations the Panel then stated:

When considered in conjunction with the officer's education, training and experience in drug law enforcement, these observations may lead to an educated hunch but are insufficient to create a reasonable suspicion that Appellee was engaged in the sale of illegal drugs on the date in question.

*Id.*, at 595. The above passages illustrate an important point. While certain activity may seem generally suspicious or "fishy," it does not necessarily equate to "reasonable suspicion" for purposes of search and seizure law. The term "reasonable" relates to a level deemed sufficient to justify the intrusion that accompanies being stopped and questioned by the police. In *Carter*, after observing what Officer Kinavey observed, many would presume that they had just witnessed the beginning of a drug exchange that was aborted only by the observance of Officer Kinavey. It could then be surmised that Carter was in possession of narcotics. Yet, the observations, while perhaps reasonably supporting this presumption, or educated hunch, were not definitive enough of the proposition to rise to "reasonable" suspicion for purposes of the Fourth Amendment or Article One, Section Eight.

¶ 6 Notably, in cases involving suspicion of having witnessed a drug transaction, the caselaw would seemingly require the observance of an exchange of some sort. Indeed, a notable feature of the *Carter* example is the absence of a perceived exchange of items. The panel states: "The officer saw Appellee put his hand in his pocket as he spoke to the occupants of the vehicle ... but did not observe exchange

of items." *Id.* *Carter* is not alone in this regard.

¶ 7 *Commonwealth v. Tither*, 448 Pa.Super. 436, 671 A.2d 1156 (1996), represents another holding consistent with the above assessment. To set up the facts we quote from the *Tither* opinion:

In this case, the officer, a 23–year veteran in full uniform and in a marked police vehicle, was on routine patrol at about 6:55 p.m. in a section of Bristol Township, Bucks County, Pennsylvania, known to this officer for frequent drug transactions and prostitution problems. For 11 years prior to this incident, the officer had patrolled this particular area of the Township. During his 23 years of service, he made 40 to 50 drug arrests, including in this particular area.

Suddenly he heard someone yell, "5–0, 5–0." He knew this to be street jargon warning that police are in the area. He then noticed several things at the same time. He observed an Oldsmobile Cutlass automobile stopped in the middle of the one-way street about 100' in front of him. He noted people on the sidewalk. He also noticed a male standing in the street, reaching into the car. Upon hearing "5–0, 5–0" being yelled, the male left the car and walked into the nearest building. The car pulled away immediately. The officer concluded that he was witnessing a possible drug sale and he proceeded to try to follow the vehicle to stop it and look for drugs. Meanwhile, other cars got between them. Finally, the Oldsmobile made a left turn and so did the officer. The Oldsmobile then pulled over on its own and stopped. The officer had not activated his overhead lights. He noted that the interior light was on in the car, and he observed the female driver looking towards the right and downward. The male passenger looked left and downward toward the middle of the seat.

The officer stopped behind the Oldsmobile and approached on foot. As he arrived at the rear of the vehicle, it started to pull away so he knocked on the side windows of the vehicle. The defendant stopped the vehicle again. (Trial Court Opinion, p. 2–3). Upon speaking with appellant, the officer sensed an odor of alcohol on her person and observed alcoholic beverages in the vehicle. Appellant was asked to perform a field sobriety test which she failed. Subsequent to her arrest, appellant was given two Intoximeter 3000 tests which revealed that her blood alcohol level was .201 and .204.

*Id.*, 671 A.2d at 1157. Since the officer did not observe a traffic violation, the legality of the stop hinged upon the observance of other circumstances that created a reasonable suspicion of criminal activity. The officer suggested that he believed a drug transaction was in progress when he happened upon the scene. We were unconvinced. In declining the officer's proffered grounds for the stop the panel highlighted the fact that the officer saw no transaction of any kind, nor did he see any drugs or money in the possession of either party. After observing that prior caselaw had held that the witnessing of a exchange, without more, even in a place known for drug trafficking, did not establish probable cause for an arrest the panel stated: "In the present case, the officer did not even observe an exchange between appellant and the man leaning into her window. The officer did not witness any actions which would suggest a transaction, let alone a drug transaction."[2] *Id.*, 671 A.2d at 1158.

---

**2.** While the *Tither* panel references cases dealing with probable cause for arrest, nota-

bly, they analyzed the case under the "reasonable suspicion" standard, not a probable

■ ¶ 8 Drawing upon the above precedent, in the present case Officer Schaffer may have observed activity that seemed "fishy" to her or may have created an "educated hunch" that something illegal might be taking place, namely someone seeking drugs. However, on balance, her observations were simply insufficient to rise to the level deemed reasonable to allow the intrusion of an investigative detention. While observing an individual entering and exiting Appellant's vehicle, she observed no exchange of items or transaction. The actions of individuals entering and exiting the vehicle are not any more indicative of a drug transaction than was the fraternizing between a pedestrian and the occupants of a vehicle that occurred in *Carter* and *Tither.* Additionally, in both of those cases, evasive actions were taken once police were observed, a factor that was missing in the present case. Yet, even that factor did not create the "reasonable suspicion" necessary to justify an investigative detention.[3] Consequently, in the present case, the initial stop of Appellant was without the requisite "reasonable suspicion" and, therefore, illegal.

■ ¶ 9 The above analysis aside, even if it were presumed that the observations of Office Schaffer created reasonable suspicion, the stop of Appellant's vehicle would still be in constitutional jeopardy as it would seem that the stop that took place here was not really an investigative detention, as the suppression court opined, but rather, for search-and-seizure purposes, a custodial detention or seizure. Notably, immediately after Appellant's vehicle was stopped he was ordered out of his vehicle and read his *Miranda* rights. Determining the nature of an encounter between citizens and police is a matter for case-by-case analysis yet when the recited standard for making the determination is compared to the facts of this case, only one honest conclusion can be reached: that Appellant was in custodial detention or "seized" prior to the discovery of the heroin packet in his mouth. As noted above, in *Commonwealth v. Strickler,* 563 Pa. 47, 757 A.2d 884 (2000), our Supreme Court reiterated the long established differences in the types of encounters between police officers and the citizenry. With respect to the highest of these, a custodial detention, the Court noted that the standard was the same as a seizure of the person under Fourth Amendment law. The Court then stated:

> To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in view of all surrounding circumstances, a reasonable person would have believed that he was free to leave. *See [U.S. v. ]Mendenhall,* 446 U.S. [544] at 554, 100 S.Ct. [1870] at 1877[, 64 L.Ed.2d 497 (1980)]; *[Florida v. ]Royer,* 460 U.S. [491] at 502, 103 S.Ct. at [1319] 1326–27[, 75 L.Ed.2d 229

cause standard, and concluded that reasonable suspicion was lacking.

**3.** Moreover, although grounded in *dicta,* it appears that even witnessing an exchange, without witnessing more, might be insufficient grounds to make an investigative detention in the eyes of our Supreme Court. In *Commonwealth v. Banks,* 540 Pa. 453, 658 A.2d 752 (1995), while considering probable cause to arrest and finding it lacking, our Supreme Court stated:

This conclusion is consistent with our recent decision in *Commonwealth v. DeWitt,* 530 Pa. 299, 608 A.2d 1030 (1992), where we found insufficient evidence to justify a mere investigatory stop on more facts than exist in the present case.

The facts of *Banks,* considered deficient by our Supreme Court, were the witnessing of an exchange, an unidentified item for cash, along with flight upon observance of the police.

(1983)]. *See generally supra* note 2. In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained. *See Mendenhall,* 446 U.S. at 553, 100 S.Ct. at 1877.

*Id.,* 757 A.2d at 884. In the present case, Appellant was not merely stopped and asked a few questions under relatively non-authoritative or non-coercive conditions. Rather, he was compelled to stop his vehicle by show of police authority, ordered out of his vehicle [4] and given *Miranda* warnings. It is our belief that the average layperson would equate being *Mirandized* with being placed in police custody. Moreover, it would be disingenuous to assert that a reasonable person in Appellant's shoes would have felt free to leave the scene had he wished to. In fact, by no stretch of the imagination was Appellant "free to leave" the scene had he been of a mind to do so.

¶ 10 Our decision in the above respect would appear supported by our Supreme Court's recent decision in *Commonwealth v. Freeman,* 563 Pa. 82, 757 A.2d 903 (2000) [5]. In that case, the stop of Diana Freeman began with justification, as a Pennsylvania State Police Trooper observed two vehicles engaging in a "cat and mouse" type chase sequence which violated regulations regarding changing of lanes. After the two vehicles were stopped, Freeman was initially given a written warning regarding improper lane changing. Her license and registration were returned to her and she was informed that she was "free to leave." Shortly thereafter, however, and prior to Freeman leaving the

scene, the Trooper returned to Freeman's vehicle and asked her if she had been travelling with the other vehicle. Freeman responded negatively, but this response contradicted what occupants of the first vehicle had related. Suspicions aroused, Freeman was then asked to exit her vehicle by the Trooper. After she exited the vehicle the Trooper asked Freeman for permission to search the trunk of the car. Freeman granted the Trooper permission and an ensuing search resulted in the discovery of five plastic bags of marijuana.

¶ 11 In considering the legality of the search our Supreme Court concluded that although the initial stop was justified by observance of a violation of the Motor Vehicle Code the subsequent encounter constituted a seizure for Fourth Amendment purposes. The Court states:

> The transition to and character of the subsequent interaction, however, supports the conclusion that Freeman was subject to a second seizure.... the trooper's subsequent actions were inconsistent with his statement to Freeman that she was free to leave, as he: returned to Freeman's vehicle; questioned her about the second vehicle; pointed out the inconsistent statements from the vehicle's occupants when she denied traveling with that vehicle; and, ultimately **and most significantly, asked her to step out of the vehicle prior to the request for consent.** Such directive constituted a greater show of authority than had previously been made (other than the physical stop of Freeman's vehicle itself).

---

**4.** The fact that the trial court indicates that he was asked to exit the vehicle is of no consequence. Under the circumstances, the request could in no way be viewed as discretionary. For all intents and purposes, it car-

ried the same degree of compulsion as being "ordered" out of the vehicle.

**5.** *Freeman* was decided in conjunction with the afore cited *Strickler.*

*Id.*, 757 at 907. The Court's emphasis upon the request of Freeman to exit the vehicle is highly significant. As the Court's language suggests, this action conveyed a greater exercise of police authority and, by implication, conveyed a much stronger sense that Freeman was not free to leave the scene.

¶ 12 In the present case not only was Appellant asked to exit his vehicle he was then given *Miranda* warnings. This was certainly a significant display of authority that would convey to a reasonable person the understanding that one was not free to leave. Under applicable authority, the initial stopping of Appellant's vehicle may have constituted only an investigative detention. However, once Appellant was ordered to exit his vehicle and given *Miranda* warnings he had been fully "seized" for search and seizure law purposes and was, therefore, in custodial detention. Notably, the police officers effectuating the stop gained no greater suspicion of criminal activity from the time Appellant was pulled over until taking these additional steps. As such, it is necessary that the seizure be supported by probable cause and not merely "reasonable suspicion." Assuming momentarily, and contrary to our prior conclusion, that the observances of Officer Schaffer met the standard of "reasonable suspicion," it clearly did not meet the more stringent standards of probable cause necessary to support a "seizure." As such, the ultimate seizure of contraband from Appellant's mouth was illegal and the fruits of that seizure should have been suppressed. Thus, under either analysis, the seizure of incriminating contraband was unsupported by the constitutionally mandated level of suspicion/reasonable cause and fails constitutional scrutiny. As such, the contraband should have been suppressed. As it was not, we must vacate the judgment of sentence and remand for a new trial.

¶ 13 Judgment of sentence vacated, remanded for a new trial. Jurisdiction relinquished.