J-A01015-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHRISTOPHER MINNICH | : | |
| | : | |
| Appellant | : | No. 238 EDA 2019 |

Appeal from the Judgment of Sentence Entered December 17, 2018
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0008443-2017

BEFORE:   NICHOLS, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY NICHOLS, J.:                          Filed: April 9, 2020

Appellant Christopher Minnich appeals from the judgment of sentence imposed following his bench trial conviction for possession of a controlled substance with intent to deliver (PWID) and related offenses.  Appellant argues that the trial court erred by denying his pre-trial motion to suppress. We affirm.

We summarize the facts set forth at the suppression hearing.  Bristol Township Police Officer Dennis Leighton testified that he had been a police officer since 2002, and was assigned to the narcotics division in 2014.  N.T. Suppression Hr'g, 4/17/18, at 8.  Officer Leighton stated that he previously served six years on an FBI violence task force focused on narcotics investigations.  *Id.* at 7-8.  He also indicated that he had conducted

---

[*] Retired Senior Judge assigned to the Superior Court.

investigations in "well over [one hundred]" cases involving hand-to-hand drug transactions. *Id.* at 9.

At approximately 8:08 p.m. on May 31, 2016, Officer Leighton, who was off duty, took his wife to Dairy Delite, an ice cream stand located on Bristol Pike in Bucks County. *Id.* at 10-11. Officer Leighton was driving his personal vehicle and wearing plain clothes. *Id.* at 11. Officer Leighton pulled into a parking spot at Dairy Delite and he saw a female driver pull her vehicle pull into the spot next to him. *Id.* at 13. At that time, Officer Leighton made eye contact with Appellant, who was seated in the front passenger seat of the other vehicle. *Id.* at 13, 33. After Appellant exited the vehicle, Officer Leighton observed Appellant walk towards Under the Pier, a restaurant located across the street from Dairy Delite. *Id.* at 14.

Officer Leighton explained that Appellant "was walking at a pretty brisk pace across the parking lot. And at no time did his direction waiver. It was pretty much in a straight line towards the Under the Pier [restaurant]." *Id.* at 15. Officer Leighton stated that Appellant "was looking over his shoulders left and right" but ultimately "walked directly to the person that was standing in that parking lot." *Id.* at 16.

Officer Leighton continued to watch Appellant as the officer and his wife walked towards the line for ice cream. Appellant, who was still in the Dairy Delight's parking lot, appeared to be "looking around the parking lot" of Under the Pier. *Id.* at 14. Officer Leighton then saw another male in the Under the Pier parking lot "pacing back and forth[,] looking back at" Appellant. *Id.* At

that point, Appellant walked "past the area of the Dairy Delite where you would go to purchase your ice cream," and "continued to cross the jughandle and then met with the male that was standing in [the] parking lot of Under the Pier." *Id.*

Officer Leighton indicated that he was initially "suspicious of the behavior" because Appellant walked "across an open business to another open business that has its own separate parking lot and [is] separated by a street and a jughandle, and then there's another male who is just meandering in that parking lot waiting for [Appellant] to arrive." *Id.* at 36. Officer Leighton called the dispatch operator for the Bristol Township Police and requested that a uniformed police officer investigate what he believed was a possible drug transaction. *Id.* at 27, 51.

While he was on the phone with dispatch, Officer Leighton continued to observe Appellant and the other male. *Id.* at 14, 27. After a brief interaction, the two men got into a green car in the Under the Pier parking lot. *Id.* at 15. Appellant sat in the front passenger seat and the other male sat in the driver's seat. *Id.* at 15. Officer Leighton stated that while the two men were in the vehicle, he saw Appellant turn his upper body toward the other male, who was seated on the driver's side. *Id.* at 25. He also saw Appellant move his right shoulder forward. *Id.* Officer Leighton explained that, based on his experience, "the actions that occurred the time that they were inside of the vehicle, [were] extremely consistent with observations that [Officer Leighton has] made [during] actual controlled purchases where informants have

returned with narcotics." ***Id.*** After approximately two minutes, both men exited the vehicle. ***Id.*** at 24. The male entered the Under the Pier restaurant, and Appellant walked back towards the Dairy Delite parking lot.[1] ***Id.*** at 26.

By this point, Officer Leighton explained that was suspicious of Appellant based on

> the mannerisms and the behavior that I was observing that I have seen numerous times prior to that [day]. The interactions, the brief amount of time, the separation between the parking lots, the two vehicles, all of that helped formulate my opinion as to what I believed was occurring there at that moment, because I observed those same behaviors with other people who I have not known or met before in other parts of Bristol Township where I ultimately made narcotics arrests.

***Id.*** at 40.

Further, Officer Leighton explained that "[i]f I had arrived there and just observed the two of them just being in the car," then it could be consistent with two people exchanging a legal object. ***Id.*** at 41. However, "based upon everything else, on my training and experience, what I believed I had observed was a drug transaction." ***Id.***

After returning from the Under the Pier parking lot, Appellant walked over to his female companion, who was standing in the ice cream line directly in front of Officer Leighton and his wife. ***Id.*** At that time, while standing about five feet behind Appellant, Officer Leighton asked, "did you just drop off

---

[1] At the suppression hearing, Appellant testified that he went to Under the Pier "to talk[] with a friend." ***Id.*** at 80. However, the trial court credited Officer Leighton's version of events.

or did you pick up?" *Id.* at 27. Appellant asked if Officer Leighton was talking to him. *Id.* at 28. Officer Leighton responded by repeating his question. *Id.* at 29. Officer Leighton saw Appellant "make a hard swallow, he had a confused look on his face" and "was able to physically observe the arteries in his neck beg[i]n to pulse very pronounced." *Id.* Appellant also "got a little irate, a little upset" and accused Officer Leighton "of embarrassing him while he was standing in line." *Id.* Officer Leighton testified that up until this point, he had not identified himself as a police officer. *Id.* at 45.

After this brief exchange with Appellant, Officer Leighton told Appellant that he "observed him walk across the parking lot, meet with a guy in a completely different parking lot, enter his car, and then come back there" and that he "believed that [he] had just witnessed a drug transaction." *Id.* at 29. Officer Leighton then identified himself as a police officer and told Appellant that he needed to "hang out there for a couple minutes" because uniformed police officers were on the way. *Id.* at 29-30.

Approximately two minutes later, Officer John Yeiter arrived at the scene. *Id.* at 47. Officer Yeiter was on duty and in full uniform. Officer Yeiter asked Appellant for identification, but Appellant stated that he did not have any identification on his person. *Id.* at 66. However, Appellant provided his name and date of birth. *Id.* After running Appellant's name through police dispatch, Officer Yeiter determined that Appellant had an active warrant for an unrelated matter. *Id.* at 61-62. Based on that information, Officer Yeiter arrested Appellant and took him into custody. *Id.* at 62. During a search

incident to Appellant's arrest, Officer Yeiter found a bag of methamphetamine. *Id.* at 68-69.

Appellant was later charged with PWID, possession of a controlled substance, possession of drug paraphernalia, and possession of a small amount of marijuana.[2]  *See* Criminal Compl., 12/15/16; *see also* Criminal Information, 1/4/18.  On March 1, 2017, Appellant filed an omnibus pretrial motion.  Therein, Appellant argued that he was subject to an illegal seizure and an illegal arrest, and that any evidence resulting from those illegalities should be suppressed.  *See* Omnibus Pretrial Mot., 3/1/17, at 2-3 (unpaginated).  The trial court held a suppression hearing on April 17, 2018.  At the hearing, Appellant challenged the legality of the seizure and subsequent search.  *See* N.T. Supp. Hr'g, 4/17/18, at 91-94.

The following day, the trial court denied Appellant's motion.  The trial court made on-the-record findings of fact and conclusions of law, crediting the testimony of both Officer Leighton and Officer Yeiter.  *See* N.T. Trial, 4/18/18, at 3-10.  The trial court found that (1) Appellant's initial interaction with Officer Leighton was a mere encounter; (2) after the mere encounter, Officer Leighton had reasonable suspicion to conduct an investigatory detention; (3) Officer Yeiter had probable cause to arrest Appellant based on his active bench

_____

[2] 35 P.S. § 780-113 (a)(30), (a)(16), (a)(32), and (a)(31)(i), respectively.

warrant in an unrelated matter;[3] and (4) Appellant was not entitled to suppression, as there was no illegal action by the police. *Id.* at 10.

That same day, the trial court held a bench trial and found Appellant guilty on all charges. On December 17, 2018, the trial court sentenced Appellant to an aggregate term of eighteen to sixty months' incarceration.

On January 15, 2019, Appellant filed a timely notice of appeal. He subsequently filed a court-ordered Pa.R.A.P. 1925(b) statement. The trial court issued a Rule 1925(a) opinion addressing Appellant's claims.

On appeal, Appellant raises the following issues, which we have reordered as follows:

1. Did the [t]rial [c]ourt err in concluding that Officer Leighton's initial encounter with Appellant was a mere encounter rather than an investigative stop[?]

2. The [t]rial [c]ourt erred in ruling that there was a totality of the circumstances that justified reasonable suspicion for an investigative stop and detention of Appellant.

3. Given the totality of the circumstances, did the [t]rial [c]ourt err in ruling: against Appellant's [s]uppression motion; finding that the subsequent search and seizure of Appellant was justified; and, ruling against Appellant's request that the fruits of the poisonous tree be suppressed[?]

Appellant's Brief at 6.

All of Appellant's claims focus on the nature of the brief interaction between Officer Leighton and Appellant. In his first issue, Appellant argues

---

[3] Although Appellant challenged the legality of his arrest during the suppression hearing, he has not raised this issue on appeal.

that a seizure occurred when Officer Leighton asked Appellant if he was "picking up or dropping off." *Id.* at 18. Appellant asserts that "Officer Leighton did not ask Appellant if he could talk to him, rather, Officer Leighton immediately accuse[d] Appellant by stating 'did you drop off or pick up?'" *Id.* at 20. Under these circumstances, Appellant contends that "a reasonable person would not have been able to decline Officer Leighton's requests or terminate the encounter." *Id.* at 21. Appellant also argues that, when Officer Leighton called for uniformed officers, he had already "formed the opinion that criminal behavior was afoot, despite no articulable facts to support his opinion other than a premonition." *Id.* at 17. Appellant claims that, by calling for backup, Officer Leighton "acted on his hunch prior to his initial encounter with Appellant." *Id.* at 18.

The Commonwealth responds that, until the point that Officer Leighton identified himself as a police officer and told Appellant he was not free to leave, his exchange with Appellant was a mere encounter. Commonwealth's Brief at 10.

We apply the following standard when reviewing the denial of a suppression motion:

> [O]ur initial task is to determine whether the [trial court's] factual findings are supported by the record. In making this determination, we must consider only the evidence of the prosecution's witnesses, and so much evidence of the defense that remains uncontradicted when fairly read in the context of the record as a whole. When the evidence supports the factual findings, we are bound by such findings; we may reverse only if the legal conclusions drawn therefrom are erroneous.

***Commonwealth v. Bryant***, 67 A.3d 716, 724 (Pa. 2013) (citation omitted).

It is well settled that "Article I, § 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution both protect the people from unreasonable searches and seizures.  Jurisprudence arising under both charters has led to the development of three categories of interactions between citizens and police." ***Commonwealth v. Lyles***, 97 A.3d 298, 302 (Pa. 2014) (citations omitted).

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest.  Finally, an arrest or "custodial detention" must be supported by probable cause.

***Commonwealth v. Pakacki***, 901 A.2d 983, 987 (Pa. 2006) (citations omitted).

"In evaluating the level of interaction, courts conduct an objective examination of the totality of the surrounding circumstances.  We are bound by the suppression court's factual findings, if supported by the record." ***Lyles***, 97 A.3d at 302 (citations omitted).  However, the issue of whether "a seizure occurred [] is a pure question of law subject to plenary review." ***Id.*** (citation omitted).

> No bright lines separate these types of encounters, but the United States Supreme Court has established an objective test by which courts may ascertain whether a seizure has occurred to elevate the interaction beyond a mere encounter.  The test, often referred to as the "free to leave test," requires the court to determine

whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. Whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person.

*Commonwealth v. Adams*, 205 A.3d 1195, 1200 (Pa. 2019) (citations and some formatting omitted).

"A mere encounter may escalate into an investigatory detention or seizure if police action becomes too intrusive." *Commonwealth v. Young*, 162 A.3d 524, 529 (Pa. Super. 2017) (citation omitted). In considering the totality of the circumstances, we must focus on "whether the suspect has in some way been restrained by physical force or show of coercive authority." *Id.* (citation omitted). This Court has provided a non-exhaustive list of relevant factors, including:

the number of officers present during the interaction; whether the officer informs the citizen they are suspected of criminal activity; the officer's demeanor and tone of voice; the location and timing of the interaction; the visible presence of weapons on the officer; and the questions asked. Otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Commonwealth v. Collins*, 950 A.2d 1041, 1047 n.6 (Pa. Super. 2008) (*en banc*) (citation omitted).

"Although no single factor controls our analysis, both the United States and Pennsylvania Supreme Courts have held that the approach of a police officer followed by questioning does not constitute a seizure." *Young*, 162 A.3d at 529 (citation and quotation marks omitted); *but see*

*Commonwealth v. Parker*, 161 A.3d 357, 364 (Pa. Super. 2017) (holding

that "[t]he presence of two officers, along with [one officer's] suggestion that

[the defendant] was suspected of criminal activity, gave rise to an

investigative detention, because a reasonable person in [the defendant's]

position would not have felt free to leave.")

Here, the trial court addressed Appellant's initial interaction with Officer

Leighton as follows:

> [Officer] Leighton was off-duty and with his wife. They were waiting in line (in a public place) to purchase ice cream, when [Officer] Leighton [made] specific observations of Appellant and another male engaged in a brief transaction of some kind inside a vehicle. [Officer] Leighton asked Appellant whether he was picking up or dropping off. Appellant argues we erred in our determination the initial conversation between Appellant and [Officer] Leighton was a mere encounter, since [Officer] Leighton had called for uniformed officers prior to this contact with Appellant. We disagree. The fact [Officer] Leighton called for uniformed officers prior to his contact with Appellant is insignificant. An off-duty officer can call for police backup at any time to report suspicious activity. The act of calling for police backup does not convert a mere encounter into an investigatory detention. A mere encounter between police and a citizen rises to the level of an investigatory detention only when the police conduct a seizure of the person involved. Here, no such seizure initially occurred.

Trial Ct. Op. at 7 (citations omitted).

Based on our review of the record, we agree with the trial court that, up

until the moment that Officer Leighton identified himself as a police officer and

instructed Appellant not to leave, the interaction was a mere encounter. *See*

*Lyles*, 97 A.3d at 302; *see also Young*, 162 A.3d at 529. Initially, when

- 11 -

Officer Leighton asked Appellant if he was "picking up or dropping off," Officer Leighton was in plain clothes and had not yet identified himself as a police officer. *See* Trial Ct. Op. at 4, 8. Further, Appellant was unaware that Officer Leighton called to request uniformed officers, as Officer Leighton finished the phone call before Appellant returned from Under the Pier. Therefore, because Appellant was unaware that Officer Leighton was a police officer or that he had called for backup,[4] these facts could not affect whether Appellant, or a reasonable person in Appellant's position, would have felt restrained. *See Young*, 162 A.3d at 529; *cf. Parker*, 161 A.3d at 364 (concluding that a reasonable person would not feel free to leave when he is approached by investigating officers and accused of criminal wrongdoing). Based on the totality of the circumstances, we conclude that a reasonable person in Appellant's position would have felt free to leave. *See Young*, 162 A.3d at 529*; see also Adams*, 205 A.3d at 1200. Accordingly, Appellant is not entitled to relief on his first issue. *See Lyles*, 97 A.3d at 302.

We address Appellant's remaining issues together. In his second claim, Appellant argues that the totality of the circumstances were "grossly insufficient to find reasonable suspicion" to justify Officer Leighton's investigative detention of Appellant. Appellant's Brief at 30. Appellant asserts that there were no "specific and articulable facts which, in conjunction with

---

[4] To the extent Appellant suggests that Officer Leighton "acted on his hunch" by calling for backup, his claim is meritless. Appellant provides no support for his contention that an officer's request for backup automatically transforms a mere encounter into an investigative detention.

rational inferences derived from those facts, g[a]ve rise to a reasonable suspicion of criminal activity." *Id.* Further, he argues that "even considered in light of the totality of the circumstances from the perspective of a trained police officer," Appellant's conduct did not suggest that he was involved in criminal activity. *Id.* at 31. Relying on *Commonwealth v. Donaldson*, 786 A.2d 279 (Pa. Super. 2001) and *Commonwealth v. Walton*, 63 A.3d 253 (Pa. Super. 2013), Appellant asserts that there was no reasonable suspicion for the stop, as his "conduct appears innocuous and substantiates no conclusion by Officer Leighton other than a premonition and a hunch." *Id.*

In his third claim, Appellant contends that because he was unlawfully detained, the trial court should have granted his motion to suppress physical evidence. *Id.* at 31-32. He asserts that because Officer Leighton did not possess "reasonable suspicion to effectuate a stop and seizure . . . the evidence obtained as a result of Officer [Leighton's] illegal conduct constitutes 'fruit of the poisonous tree.'" *Id.* at 31.

As noted previously, the Commonwealth agrees that Appellant was seized from the moment that Officer Leighton identified himself as a police officer and instructed Appellant not to leave. Commonwealth's Brief at 10-12. The Commonwealth also argues that Officer Leighton had reasonable suspicion to justify the seizure, and therefore, the trial court properly denied Appellant's motion to suppress. *Id.* at 17.

An investigatory detention "is justified only if the detaining officer can point to specific and articulable facts which, in conjunction with rational

inferences derived from those facts, give rise to a reasonable suspicion of criminal activity and therefore warrant the intrusion." ***Commonwealth v. Hall***, 735 A.2d 654, 659 (Pa. 1999) (citation omitted). The officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." ***Commonwealth v. Carter***, 105 A.3d 765, 768–69 (Pa. Super. 2014) (*en banc*) (citation omitted).

> In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. In making this determination, we must give due weight to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

***Commonwealth v. Stilo***, 138 A.3d 33, 39 (Pa. Super. 2016) (citation omitted).

> Here, the trial court explained that

> [Officer Leighton] observed [Appellant] walk across the Dairy Delite parking lot toward the Under the Pier restaurant. [Appellant] was walking at a brisk pace toward another male in the Under the Pier parking lot. [Officer] Leighton observed [Appellant] and the other male have a brief interaction and then enter a green Plymouth vehicle parked in the Under the Pier parking lot. [Appellant] and the other male remained inside the vehicle for approximately two minutes. [Officer] Leighton observed [Appellant's] body turn toward the other male while inside the vehicle, consistent with [Officer] Leighton's experience observing hand-to-hand transactions. [Officer] Leighton never actually saw the defendant and the other male exchange anything, but based on his previous training and experience, he believed and suspected a drug transaction had occurred. Based on this belief, [Officer] Leighton called the police operator and requested

uniformed officers respond to his location. [Appellant] and the other male then exited the green Plymouth vehicle.

Trial Ct. Op. at 3-4 (some formatting altered).

Further, Officer Leighton stated that after he began speaking to Appellant,

Appellant swallowed hard, appeared confused, got mad and accused [Officer] Leighton of trying to embarrass him after this brief conversation. Appellant's reactions, demeanor, and evasive answers instinctively caused [Officer] Leighton to identify himself as a police officer and display his badge. [Officer] Leighton advised Appellant he was the subject of an official narcotics investigation and uniformed officers were on their way. We found the aforesaid observations by [Officer] Leighton, combined with his extensive experience in narcotics transactions, clearly supported his belief that criminal activity was afoot.

In looking at the totality of the circumstances here, the police acted appropriately by detaining Appellant to conduct an investigation. This investigatory stop and detention was supported by reasonable suspicion criminal activity was afoot.

*Id.* at 8.

Following our review, we discern no error in the trial court's conclusion that Officer Leighton testified to specific and articulable facts that gave rise to reasonable suspicion. *See Stilo*, 138 A.3d at 39. Officer Leighton testified to his concern about the circumstances of Appellant's meeting with the other male, including the brief duration, the separate parking lots, the two vehicles, and the movements that both individuals made while they were inside of the vehicle. Officer Leighton also referenced Appellant's demeanor, mannerisms, and behavior during their brief exchange in the ice cream line. Officer Leighton explained that, based on his experience with narcotics investigations,

- 15 -

the totality of these factors indicated that Appellant was engaged in an illegal drug transaction.

Further, the trial court properly viewed the totality of the circumstances and afforded due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience. *See id.* Accordingly, the trial court properly determined that there was reasonable suspicion to justify Appellant's detention.

To the extent Appellant relies on ***Donaldson*** and ***Walton***, both cases are distinguishable. In ***Donaldson***, a police officer conducted a vehicle stop after she saw an individual entering and exiting the defendant's vehicle in an area known for drug activity. ***Donaldson***, 786 A.2d at 284. On appeal, this Court concluded that although the officer observed conduct that might have been "fishy" or led to an "educated hunch" of illegal activity, it did not equate to reasonable suspicion. *Id.* at 284. We explained that the officer did not observe an "exchange of items or transaction" and that, without more, the actions of the individuals entering and exiting the defendant's vehicle were not necessarily "indicative of a drug transaction." *Id.*

In ***Walton***, an officer saw a male and a female pacing around a parking lot while on their cell phones. ***Walton***, 63 A.3d at 255. After the defendant pulled his vehicle up next to the male and female, the officer activated his lights and stopped the defendant for what he believed was a possible drug transaction. *Id.* The officer testified that "this conduct 'looked kind of suspicious to [him]'" because drug transactions often occur in parking lots.

*Id.* at 257-58. On appeal, this Court concluded that the officer did not have reasonable suspicion to justify the vehicle stop, noting that "without more, [the officer's] observations [were] consistent with innocent activity and nothing more than a hunch a drug transaction was to transpire." *Id.* at 258.

Here, Officer Leighton observed Appellant's behavior as he walked from Dairy Delite to the parking lot at Under the Pier. Then, after Officer Leighton saw Appellant get into the other male's car, he saw what he believed was an exchange. Officer Leighton continued to observe Appellant until he returned from the Under the Pier parking lot. Then, when Officer Leighton asked Appellant if he was "picking up or dropping off," Officer Leighton noticed that the arteries in Appellant's neck began to pulse, and that Appellant became upset and irate. *See* N.T. Suppression Hr'g at 29. At that point, Officer Leighton concluded that, based on his training and experience, there was reasonable suspicion to suspect that Appellant was engaged in criminal activity. Unlike the officers in *Donaldson* and *Walton*, Officer Leighton observed more than just a "fishy" or somewhat suspicious interaction. Instead, Officer Leighton corroborated his belief that Appellant participated in a drug transaction by specifically observing Appellant's demeanor during their face-to-face interaction. Based on the totality of these circumstances, we agree with the trial court that Officer Leighton had reasonable suspicion to detain Appellant. *See Stilo*, 138 A.3d at 39.

Finally, because the seizure was lawful, the trial court properly denied Appellant's suppression motion on that basis. ***See Bryant***, 67 A.3d at 724. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/9/20