# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: $300,000 in U.S. Currency | : | CASES CONSOLIDATED |
| | : | |
| | : | |
| Appeal of: Zhi Xiong Xu | : | No. 520 C.D. 2022 |

| | | |
|---|---|---|
| In re: $300,010 in U.S. Currency | : | |
| | : | |
| | : | No. 521 C.D. 2022 |
| Appeal of: Zhi Xiong Xu | : | Argued: April 5, 2023 |

BEFORE:     HONORABLE RENÉE COHN JUBELIRER, President Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE LORI A. DUMAS, Judge
                HONORABLE STACY WALLACE, Judge

OPINION BY
PRESIDENT JUDGE COHN JUBELIRER     FILED: February 1, 2024

Zhi Xiong Xu (Appellant) appeals the Order entered in the Court of Common Pleas of Union County (trial court or suppression court), granting the Commonwealth of Pennsylvania's (Commonwealth) "Motion for Order of Forfeiture" (Forfeiture Motion) pursuant to the Pennsylvania Controlled Substances Forfeiture Act (Forfeiture Act)[1] and dismissing Appellant's "Motion for Return of Property Pursuant to Pa.R.Crim.P. 588 and 42 Pa.C.S.[] [§] 5806" (Return of

---

[1] 42 Pa.C.S. §§5801-5808.

Property Action)[2, 3] following a Pennsylvania state trooper's seizure of $300,010.00 and an iPhone (currency and phone) from Appellant during a traffic stop. This Order also made final the suppression court's order denying Appellant's Motion to Suppress Evidence (Suppression Motion) on the basis Appellant was subjected to an investigative detention and unreasonable seizure without any evidence of illegal activity. The suppression court determined that, under the totality of the circumstances, Appellant's detention was justified as there was reasonable suspicion he was involved in criminal activity. The trial court determined based upon a disclaimer and acknowledgement form (Form) Appellant later signed that the currency had been used in illegal drug trafficking in violation of the Controlled Substance, Drug, Device and Cosmetic Act (Drug Act).[4] The instant appeal requires us to consider whether the currency and phone were the products of a lawful search and seizure as well as the validity of the Form and the extent it can be used to meet

---

[2] Rule 588 provides:

(A) A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.

(B) The judge hearing such motion shall receive evidence on any issue of fact necessary to the decision thereon. If the motion is granted, the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited.

(C) A motion to suppress evidence under Rule 581[, Pa.R.Crim.P. 581,] may be joined with a motion under this rule.

Pa.R.Crim.P. 588.

[3] Section 5806(a)(1) states, in relevant part, that "[a] person aggrieved by a search and seizure may move for the return of the property seized by filing a motion in the court of common pleas in the judicial district where the property is located." 42 Pa.C.S. § 5806(a)(1).

[4] Act of April 14, 1972, P.L. 233, *as amended*, 35 P.S. §§ 780-101–780-144.

2

the Commonwealth's burden of proof under the Forfeiture Act to justify the forfeiture of those items where no controlled substances were found and no arrests were made. Because we find the suppression court erred in denying the Suppression Motion and, therefore, the Commonwealth cannot establish that the currency and phone were connected to an illicit drug activity, we reverse the suppression court's order entered on December 20, 2021, and we reverse the trial court's order entered on April 29, 2022, granting the Forfeiture Motion and denying Appellant's Return of Property Action.

## I.    FACTUAL BACKGROUND

On January 23, 2020, Appellant was driving a rented, silver Cadillac sport utility vehicle (SUV) westbound on Interstate 80 (I-80) when he was stopped by Trooper Christopher Isbitski (Trooper) of the Pennsylvania State Police for various violations of the Vehicle Code.[5] It was during this stop that the currency and phone that are the subject of these actions were seized.

At a hearing on Appellant's Suppression Motion on December 9, 2021, Trooper testified as follows to the traffic stop, his interactions with Appellant, and the seizure of the currency and phone. On January 23, 2020, at which time the temperature was in the low 30s and snow was on the ground, Trooper observed that while the SUV was not traveling at a high rate of speed, there was a "drastic speed reduction" when it passed his patrol car, which is "not normal with the innocent motoring public." (Reproduced Record (R.R.) at 117a, 122a-24a, 158a, 188a-89a.) Trooper also noticed the driver of the SUV appeared to be leaning back behind the

---

[5] 75 Pa.C.S. §§ 101-9805.

3

B-pillar[6] of the SUV and had both hands on the wheel in the "10 and 2 position." (*Id.* at 123a, 159a, 189a.) Trooper proceeded to follow the SUV, which reached 78 miles per hour, started passing other vehicles, failed to use a turn signal when changing lanes twice, and followed a tractor trailer too closely. (*Id.* at 124a-25a, 165a.)[7] After observing this driving behavior, Trooper initiated a traffic stop and noted that the SUV's right turn signal remained on when it pulled over. (*Id.* at 126a-27a.)

Trooper approached the vehicle on the passenger side and instructed Appellant to lower the window. (*Id.* at 173a-76a.) After what he described as a "[c]ordial, friendly" interaction, Trooper asked Appellant for his driver's license and paperwork for the SUV, when he learned the SUV was a rental. (*Id.* at 132a.) Trooper noticed Appellant was "[o]verly nervous and [his] hand[s] [were] shaking," and he told Appellant he would consider just giving him a warning. (*Id.* at 132a, 136a, 143a-46a.) Appellant volunteered information about his "vague travel plans," which seemed convoluted to Trooper whose suspicions were heightened when he discovered the rental agreement for the SUV was one-way from New York, LaGuardia Airport on January 23, 2020, to Denver, Colorado, on January 25, 2020. (*Id.* at 134a, 137a, 141a-44a.) Appellant indicated he was going to Columbus, Ohio, to visit a friend and the friend's child for the Chinese New Year, after which he was headed to Denver, Colorado, to see another friend. However, Trooper observed these plans "conflicted with" the two-day rental agreement for the SUV which was

---

[6] A "B-pillar is that portion of the vehicle that is partially made up of the back frame of the driver's doorway and then the frame of the vehicle to which the passenger seat would attach[.]" (R.R. at 159a.)

[7] Trooper's vehicle had a Motor Vehicle Recorder (MVR), which began recording when Trooper began following the SUV. (R.R. at 123a.) Segments of the MVR were played for the suppression court throughout the hearing and were introduced as Commonwealth's Exhibit No. 1. A transcript of the MVR was introduced as Appellant's Exhibit 1. (R.R. at 128a, 249a-77a.)

4

due to be returned in Denver the same morning Appellant indicated he would be in Columbus for the Chinese New Year. (*Id*. at 137a-39a.)

Trooper had a clear view of the interior of the vehicle and noticed a shopping bag full of snacks on the front passenger seat, which suggested "potentially long travel" along I-80. (*Id*. at 178a-79a.) Trooper did not witness Appellant make any furtive movements or attempts to reach for something within the vehicle, did not observe any weapons or drug paraphernalia, did not smell any drugs or alcohol in the SUV or "anything of note[,]" was able to determine Appellant's driver's license was valid, and did not issue a written citation or warning. (*Id*. at 177a-78a, 181a, 190a, 198a-99a.) Instead, as Trooper "conduct[ed] [the] business of the traffic stop,"[8] he asked Appellant to exit the SUV and stand at the passenger side of the police cruiser, at which time he asked Appellant to see his driver's license and vehicle documents again, because Trooper had returned these items to Appellant before the pat-down. (*Id*. at 135a-36a.) Trooper asked Appellant whether there were any firearms, drugs, or large amounts of currency in the SUV, to which Appellant responded, "[n]o, [n]o, no, no, no" and raised his hands in the air. (*Id*. at 135a, 146a-47a.) The transcript of the video recording of the encounter and the video show that, at that time, Trooper stated, "Okay. Let's pat you down so I make sure you don't have any -- any pistols or nothing like that. You know what I mean? Money -- how much money you got on you, a couple hundred bucks," to which Appellant responded, "[y]eah." (*Id*. at 254a.) Trooper testified he interpreted Appellant raising his hands as consent to search Appellant, so Trooper conducted a pat down, finding no weapons. (*Id*. at 182a, 185a-86a.) Appellant denied there was anything illegal in the SUV or that he was traveling with a large amount of money. (*Id*. at 146a-48a.)

---

[8] Trooper explained this "entail[ed] running registrations, running [Appellant]'s license, conducting a ticket or a warning, [and] conducting criminal history checks." (R.R. at 135a.)

Trooper believed "criminal activity was afoot" due to "[t]he one-way rental [from LaGuardia, New York]; the source areas from LaGuardia to Denver, Colorado; the conflicting statements that [Appellant] provided [Trooper]; [Appellant's] overly nervous [demeanor]; the vague travel plans; and [the fact Appellant was] flying home from Denver, Colorado, back to California." (*Id*. at 145a, 180a.) Trooper asked to search the SUV, and Appellant consented. (*Id*. at 148a.) Trooper asked Appellant to open a suitcase in the trunk,[9] and when Appellant did so, Trooper observed currency concealed inside. Trooper also found currency in a large paper bag in the trunk. Trooper seized the currency believing it was related to unlawful activity. (*Id*. at 149a-52a.) Trooper admitted that "no reasonable person would walk away after law enforcement had taken possession of their driver's license, their rental car agreement, their money[,] and their phone[.]" (*Id*. at 204a-05a.) During the encounter, another officer who arrived at the scene to assist with the search, identified as Corporal Mark Conrad, told Appellant, "You need to follow us back [to the barracks], wait to see what the [drug-detection K9] does, and we'll go from there," and immediately before the video of the encounter ended, he again stated, "You have to follow us out." (*Id*. at 149a, 274a, 276a.) Appellant proceeded to follow Trooper in the SUV to the barracks where he was given his *Miranda*[10] warnings by Corporal Luke Straniere (Corporal). (*Id*. at 208a-09a, 213a, 216a-17a.) Corporal explained he conducted a pat-down of Appellant to ensure he did not have any weapons prior to proceeding beyond the lobby of the barracks. Although Corporal also told Appellant he was free to leave, Corporal testified he did not inform Appellant the currency and phone would be returned to him if he did so. (*Id*. at 220a-23a.)

---

[9] Trooper clarified that this was the cargo area of the SUV. (R.R. at 209a.)

[10] *Miranda v. Arizona*, 384 U.S. 436 (1966).

6

While at the barracks, Trooper testified Appellant told Trooper he was taking the currency to Denver to buy a farm. (*Id.* at 155a.) Trooper also testified that at the barracks, Appellant provided the password to the phone and executed the Form and other waivers. (*Id*. at 154a-55a.) The Form, which was witnessed by Trooper and signed by both Appellant and him on January 23, 2020, at 3:22 p.m., reads in pertinent part as follows:

> I, [Appellant's full name], acknowledge and admit that I had [] Bulk Currency . . . seized from me by the Pennsylvania State Police, on 1/23/20. . . .
>
> I, [Appellant's Initials], acknowledge and admit that I am the owner of the above-listed property.
>
> Since the property was furnished or intended to be furnished by any person in exchange for a controlled substance, or i[t]s proceeds traceable to such an exchange, or was used or intended to be used to facilitate any violation of the Drug . . . Act, I, [Appellant's Initials], agree that the property is subject to forfeiture under the . . . Forfeiture[] Act . . . .
>
> By signing below, I, [Appellant's Initials], agree to waive my right to have a forfeiture petition filed against the seized property under the . . . Forfeiture[] Act so that a Court Order may be entered forfeiting the property to the Commonwealth.
>
> . . . .
>
> By signing below, I, [Appellant's Initials], agree and state that I am waiving my right to have a forfeiture petition filed, and my right to a forfeiture hearing, with full knowledge of the consequences of my actions and without any duress or coercion placed upon me.
>
> Lastly, by signing below, I, [Appellant's Initials] [], release and forever discharge the Commonwealth . . . , Pennsylvania State Police, Office of Attorney General, its agents, servants and employees from any and all actions, causes of actions, suits, and claims whatsoever in law or equity which claimants, their heirs, or successors, now may have or may have

7

in the future in connection with the seizure, detention[,] and forfeiture of the above property.

(R.R. at 300a-01a.)

At an April 25, 2022 hearing on the Forfeiture Motion, Trooper further testified as follows about his interaction with Appellant at the barracks. Specifically, when Trooper questioned Appellant further about the currency he had seized from the SUV, Appellant told Trooper he picked up the currency from an unknown Asian male and was bringing it back by vehicle to Denver, Colorado, on behalf of a friend who lives in Columbus, Ohio, because he did not want to fly with a large amount of money. (*Id*. at 322a.) When Trooper asked Appellant why he had lied to him about the money, Appellant indicated that "it looks bad." (*Id*.)

Trooper provided Appellant with the Form and instructed him to read it and ask any questions he may have regarding the same. Trooper told Appellant that the Form "basically gives up [Appellant's] right for forfeiture for the money, said the money was not his; that it was—[] explained the [F]orm that it was for or from drug proceeds [sic]; and that he gives up any right to a forfeiture hearing." (*Id*. at 324a.) Trooper observed Appellant's "eyes were going back and forth as it appeared—he appeared to be reading." (*Id*. at 324a-25a.) Appellant signed the Form and indicated he did not have any questions. (*Id*. at 325a.) Trooper did not have trouble communicating with Appellant, and Appellant did not appear to be confused. (*Id*. at 325a-26a.) Appellant signed the Form along with a receipt for the seized property and left the barracks. (*Id*. at 326a.) Appellant returned to the barracks the next day to retrieve the paperwork for the SUV, which Trooper had inadvertently retained. Appellant indicated that he had trouble sleeping the previous evening and felt "dizzy" and "worried about the [currency]" believing "there may be tax problems with the [currency]." (*Id*. at 327a-28a.)

8

On cross-examination, Trooper testified that while he "believe[d]" he had generally explained the provisions on the Form, Trooper admitted he did not explain the significance of each paragraph as Appellant initialed them. (*Id*. at 329a.) Rather, Trooper "did not explain each [paragraph] to him word for word" but provided Appellant only with a "general description of what the [F]orm meant" because he believed Appellant had "distanc[ed] himself from the money, saying [] it wasn't his, it was his friend's." (*Id*. at 329a-30a.) In fact, as Appellant went through the Form, Trooper did not "stand[] over [Appellant's] shoulder" and "actually backed up a few feet and wanted to give him some room." (*Id*. at 329.)[11]

## II.    PROCEDURAL BACKGROUND

Appellant filed the Return of Property Action on February 4, 2020, alleging the currency and phone were unlawfully seized. Specifically, Appellant "aver[red] that the facts and circumstances surrounding the stop of his vehicle did not give rise to probable cause to seize either the [currency or phone] pursuant to" the Forfeiture Act. (Return of Property Action ¶ 37, R.R. at 15a.) Appellant filed his Suppression Motion on February 28, 2020. Therein, he alleged Trooper questioned him regarding his travel plans while retaining Appellant's rental agreement and driver's license and never informed Appellant he was free to leave. (Suppression Motion ¶¶ 11-16, 39; R.R. at 52a-53a, 57a.) Appellant further averred he was not aware that he could refuse Trooper's request to search the SUV and that he did not have to turn over his phone. (Suppression Motion ¶¶ 18, 22, R.R. at 53a.) Appellant also alleged he felt compelled to follow Trooper to the barracks, where he was guarded and questioned extensively, because Trooper had his currency, phone, rental agreement,

---

[11] Appellant did not testify, nor did he present any witnesses or evidence on his own behalf.

9

and driver's license. (Suppression Motion ¶¶ 25-26, 70; R.R. at 53a-54a, 62a.) Appellant alleged that even if Trooper's stated basis for initially stopping him was supported by probable cause, Trooper's continued questioning exceeded any permissible scope of the traffic stop as it pertained to unrelated matters and did not support a subsequent request for Appellant, who had no criminal history, to exit the vehicle. (Suppression Motion ¶¶ 27-54, R.R. at 54a-59a.) Because Appellant was not informed he was free to leave, Appellant posited he was subjected to an investigative detention and unreasonable seizure of Appellant without any evidence of illegal activity. (*Id*.) As a result, Appellant averred all statements he made at the barracks were made following what essentially amounted to his arrest without probable cause. (Suppression Motion ¶¶ 55-75; R.R. at 59a-62a.) Because Appellant's possession of the currency and "unsatisfactory answers" to Trooper's questions did not create the requisite probable cause for Appellant to be subjected to custodial interrogation at the barracks, Appellant asked that all responses to questions or other statements he made at the barracks and any paperwork he executed there "be suppressed as the fruit of an unconstitutional arrest." (Suppression Motion ¶¶ 74-75; R.R. at 62a.)

The Commonwealth filed an answer and new matter to the Suppression Motion, and following a hearing and briefing from the parties, the suppression court denied the Suppression Motion as premature on July 31, 2020. Appellant filed a Petition for Permission to Appeal, and this Court granted the same by order of October 27, 2020. On January 14, 2021, the Commonwealth filed a petition for forfeiture (Forfeiture Action) in the trial court.[12] Thereafter, the Commonwealth also

---

[12] The forfeiture action brought by the Commonwealth was docketed at CP-60-MD-000004-2021 and was subsequently consolidated by the trial court with Appellant's Return of
**(Footnote continued on next page…)**

filed a motion to dismiss Appellant's appeal wherein the Commonwealth argued that Appellant's Return of Property Action was moot because Appellant could file a motion to suppress in the trial court as part of the Forfeiture Action. By order of February 9, 2021, this Court listed the motion to dismiss to be decided along with the merits of Appellant's appeal of the suppression court's July 31, 2020, order.

Following our review, we denied the Commonwealth's motion to dismiss, vacated the suppression court's order denying Appellant's Suppression Motion, and remanded for further proceedings upon determining that Appellant's appeal was not rendered moot as a result of the Commonwealth bringing the Forfeiture Action. *In re $300,000 in U.S. Currency*, 259 A.3d 1051, 1063 (Pa. Cmwlth. 2021) (en banc). We also held that a motion to suppress may be advanced in an action for return of property brought pursuant to Pa.R.Crim.P. 588 regardless of whether the Commonwealth files a forfeiture action or criminal charges. *Id*.

Upon remand, the suppression court held a suppression hearing, at which Trooper testified as set forth above. Following the suppression hearing, the suppression court did not make findings of fact, but it did issue its opinion and order denying Appellant's suppression motion on December 20, 2021. (Dec. Op.)

Thereafter, the Commonwealth filed the Forfeiture Motion on January 10, 2022, averring that in light of the numerous indicators of criminal activity he observed, Trooper requested permission and received Appellant's consent to search the SUV, at which time he found the currency. (Forfeiture Motion ¶ 2, R.R. at 288a-90a.) Also, at the barracks, the Commonwealth alleged a Drug-Detection K9 displayed behavior indicating its detection of controlled substances. (*Id*.) The

---

Property Action at CP-60-MD-000057-2020. Although the matters were consolidated by the trial court, Appellant filed separate notices of appeal. This Court consolidated the appeals by order dated September 23, 2022.

11

Forfeiture Motion also stated that during an ion scan of the currency conducted by the National Guard on February 13, 2020, both bundles of currency "alarmed for high levels of cocaine" indicating that the currency had been in close contact with the substance. (*Id.*) Further, the Forfeiture Motion claimed Appellant's phone contained pictures and videos of marijuana/hemp growing operations and conversations regarding money transfers. (*Id.*) Finally, the Commonwealth averred that Appellant admitted the currency had been or was intended to be used to facilitate a violation of the Drug Act, that it was subject to forfeiture, and that he was not under any duress or coercion when deciding to waive his right to a jury trial with regard to the same. (Forfeiture Motion ¶ 9, R.R. at 291a-92a.)

On January 28, 2022, Appellant filed an Answer to the Commonwealth's Forfeiture Motion (Answer). Therein, Appellant denied the enforceability of the Form and the Commonwealth's position that he signed it "without any duress or coercion[.]" (Answer ¶ 9, R.R. at 308a.) Appellant also denied that he made a "knowing, voluntary and intelligent admission that the . . . currency was related to drug trafficking." (*Id.* ¶ 10, R.R. at 308a.)

The trial court issued its April 29, 2022 Order granting the Forfeiture Motion and dismissing the Return of Property Action.[13] In its Opinion filed pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), Pa.R.A.P. 1925(a) (Rule 1925(a) Op.), on July 19, 2022, the trial court opined that the Commonwealth met the "formal requirements of the Forfeiture Act" when it submitted into evidence the Form bearing Appellant's signature. (Rule 1925(a) Op. at 6.) The trial court observed that Trooper testified he explained the Form to Appellant and told him to

---

[13] Appellant filed timely notices of appeal on May 24, 2022, and a concise statement of errors complained of on appeal on June 13, 2022, pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), Pa.R.A.P. 1925(b).

12

read it. Thereafter, Appellant executed the Form and initialed each provision acknowledging he owned the currency which was subject to forfeiture as it pertained to the sale of controlled substances; he also "waived his right to have a formal forfeiture petition filed against the seized property." (*Id*. at 5.) Stating that the Pennsylvania Supreme Court has found forfeiture agreements are analogous to plea agreements, which are contractual in nature, the trial court agreed with the Commonwealth that Appellant's consideration for executing the Form was "that he was no longer tied to the money" and further noted that, by its terms, "[Appellant] would no longer have to participate in or defend against forfeiture proceedings." (*Id*. at 6-7.) The trial court also discerned no evidence to support Appellant's position that he was under duress when he executed the Form, as Trooper testified the interaction was "friendly and cordial." (*Id*. at 8.)

## III. PARTIES' ARGUMENTS

On appeal, Appellant presents four issues for this Court's consideration. In his first two claims, he argues that Trooper exceeded the permissible scope of the initial traffic stop and subjected Appellant to an unlawful investigative detention on I-80 and subsequent arrest in violation of his right to be protected from unreasonable searches and seizures under the Fourth Amendment of the United States Constitution, U.S. Const. amend. IV, and article I, section 8 of the Pennsylvania Constitution, Pa. Const. art. I, § 8. (Appellant's Brief (Br.) at 8.) In his remaining two issues, Appellant avers that the Form constitutes a contract under Pennsylvania law and that the trial court erred in enforcing what is essentially an illusory contract as it was not supported by valid consideration and was signed by him while he was under duress. (*Id*.)

13

While Appellant does not challenge Trooper's probable cause[14] to stop the SUV for moving violations, he posits that Trooper's continuing to question him regarding his travels "exceeded the permissible scope of the traffic stop" the purpose of which "was to obtain the information necessary to address the[] traffic infractions." (*Id.* at 30-31.) Appellant notes that Trooper admitted his observations of Appellant's driving had provided him with all the information he needed to further investigate Appellant's driving infractions. Notwithstanding, after just over a minute of interaction with Appellant during which time he did not observe or smell any contraband or firearms, Trooper directed him to exit his vehicle despite Appellant's "cordial" and "friendly" demeanor. (*Id.* at 31-33.) Appellant also stresses that Trooper never asked him to consent to a pat down for weapons after he exited his vehicle, which would require a justification separate from that required for an officer to order an individual from his vehicle. (*Id.* at 33-34.) Likening the instant matter to the circumstances presented in *Commonwealth v. Lopez*, 609 A.2d 177 (Pa. Super. 1992), and citing to an en banc decision of the Superior Court in *Commonwealth v. Reppert*, 814 A.2d 1196 (Pa. Super. 2002),[15] Appellant reasons that Trooper's frisking Appellant marks a turning point in the traffic stop whereupon the seizure "transitioned from a routine traffic stop based upon probable cause that Appellant had committed minor traffic infractions to a coercive, investigative detention directed towards matters wholly unrelated to the underlying traffic stop."

---

[14] Probable cause exists when "the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime." *Commonwealth v. Thompson*, 985 A.2d 928, 931 (Pa. 2009) (citation omitted).

[15] "In general, Superior Court decisions are not binding on this Court, but they offer persuasive precedent where they address analogous issues." *Lerch v. Unemployment Comp. Bd. of Rev.*, 180 A.3d 545, 550 (Pa. Cmwlth. 2018).

14

(Appellant's Br. at 36-42.) Appellant also disagrees with the trial court that the Superior Court's decision in *Commonwealth v. Galloway*, 265 A.3d 810 (Pa. Super. 2021), supports Trooper's continued investigation after the initial traffic stop and argues the two cases are factually distinguishable. (Appellant's Br. at 44-46.) Appellant posits his encounter with police became the functional equivalent of an arrest, which is evidenced by Trooper's own admission that no reasonable person would have felt free to leave if police retained his driver's license, rental car agreement, currency, and phone, and the fact that, at the barracks, Appellant was given his *Miranda* warnings, patted down, subjected to additional interrogation, and informed the currency and phone were "under investigation." (*Id*. at 48-50.)

Appellant next argues the Form is a contract under Pennsylvania law because it is comprised of certain covenants the Commonwealth sought to enforce against him. (*Id*. at 52-53.) Appellant stresses that although the various provisions of the Form resulted in his waiving important rights, including his forfeiture of the currency and phone to the Commonwealth, Trooper testified he did not explain the significance of each portion of the Form to Appellant but gave him only a "general description" of its contents. (*Id*.) According to Appellant, the Commonwealth's enforcement of the "unilateral waiver of rights" set forth in the Form, despite the lack of consideration or mutual obligation on the part of the Commonwealth, is contrary to principles of contract law. (*Id*. at 55.) Appellant reasons that this case is factually and procedurally distinguishable from the Pennsylvania Supreme Court's decision in *Commonwealth v. Smith*, 757 A.2d 354 (Pa. 2000), upon which the trial court relied in support of its decision. (*Id*. at 54-55.)

In response, the Commonwealth argues that Trooper's conversation with Appellant in the 15 minutes which spanned the time between the initial, lawful traffic

stop and Appellant's voluntary consent to the search of the SUV "occurred simultaneously with the business of the traffic stop[;]" therefore "the stop [] continued based on [Appellant]'s consent to conduct a search of the [SUV]." (Commonwealth's Br. at 7-8.) Citing *Galloway*, the Commonwealth states that an officer may detain a driver to confirm or rule out his suspicions where a traffic stop leads the officer to reasonably suspect criminal activity, which is what Trooper did herein, and Appellant consented to the search of the SUV during this lawful stop. (*Id*. at 19-20.) According to the Commonwealth, Trooper's conversation with Appellant and request to search the SUV "was a natural follow up to [Appellant]'s unprompted statements about his travel plans[.]" (*Id*. at 19-23.) Trooper articulated his reasonable suspicion, in light of the "totality of the circumstances" "that criminal activity [was] afoot," which permitted him to conduct a brief investigative detention during the business of the traffic stop. (*Id*. at 23-24.) According to the Commonwealth, this "suspicious" activity was evident to Trooper even before he stopped the SUV. (*Id*. at 24.) As an experienced officer trained to identify aspects of criminal activity, Trooper observed Appellant attempting to conceal or hide himself behind the B-pillar as he drastically reduced his speed upon seeing Trooper's patrol cruiser only to increase it moments later and ultimately leave his turn signal on after he pulled over. (*Id*. at 24-25.) The Commonwealth also mentions Appellant's nervous demeanor, his volunteering information that he had been coming from New York and was heading to see a friend, and the presence of a bag of snacks as "multiple suspicious factors" that Trooper observed at the outset of the traffic stop, which were heightened when Appellant exited the SUV and continued to appear overly nervous and proffered his "odd, one-way travel plans by motor vehicle and then airplane." (*Id*. at 25-29.) The Commonwealth argues that the

16

instant matter is distinguishable from *Lopez* where the officer asked the driver questions about his travel plans based only upon his "intuition" because Trooper's questioning arose from "his expertise in highway interdictions and his observations of [Appellant] at every stage of his interaction with him." (*Id*. at 29-31.) The Commonwealth likens the instant matter to *Commonwealth v. Rogers*, 741 A.2d 813 (Pa. Super. 1999), where "[t]he driver's overly nervous demeanor, coupled with factors potentially indicating drug trafficking, created a reasonable suspicion of criminal activity although there was not specific evidence of drug trafficking." (Commonwealth's Br. at 31.)

The Commonwealth further reasons that although he was given his *Miranda* warnings at the barracks, Appellant was not under the functional equivalent of an arrest when he drove there. (*Id*. at 33.) The Commonwealth reasons that Trooper told Appellant while still on I-80 that he was not under arrest and was free to leave, but Appellant voluntarily drove the SUV to the barracks. If he had chosen not to do so, Trooper would have returned his driver's license and paperwork which he had retained only because Appellant was following him to the barracks. (*Id*. at 9, 34-35.) The Commonwealth states that Corporal read Appellant his *Miranda* warnings at the barracks, he told him he did not have to speak, and reiterated that Appellant was free to leave. (*Id*. at 9, 35.) Instead, Appellant told Corporal a friend from China directed Appellant to obtain the currency from an unknown male in Chinatown, New York, and bring it to Denver, Colorado, as a down payment on a farm. Appellant chose to drive instead of fly because he was not comfortable taking the currency on an airplane. (*Id*. at 10.)

According to the Commonwealth, Trooper reviewed the Form with Appellant who signed it willingly and also consented to a search of the phone. (*Id*. at 10-12.)

17

The Commonwealth also maintains Appellant has not established that the Form is a contract because the elements of "offer" and "acceptance" are lacking. (*Id*. at 37-38.) To the extent this Court applies contract principles, the Commonwealth reasons that the trial court had the "discretion to accept or reject a consent forfeiture agreement." (*Id*. at 39-40.) The Commonwealth argues that the trial court properly relied on the Form to order forfeiture of the currency because in making the "voluntary and informed choice" to sign the Form, Appellant admitted he owned the currency which was connected to illegal drug activity and that it was subject to forfeiture as derivative contraband. (*Id*. at 39-42.) The Commonwealth posits that even if the Form were to be considered a contract, Appellant received consideration in that he was no longer associated with the contraband and would not have to engage in litigation pertaining to the forfeiture petition. (*Id*. at 14-15, 44.) Finally, the Commonwealth argues that the "admissions and waivers" to which Appellant attested in the Form clearly warranted forfeiture of the currency and phone, and Appellant never timely objected to their admission into evidence. (*Id*. at 45-47.)

## IV.   ANALYSIS

### A.   *Suppression Motion*

The standard of review over a trial court's order denying suppression requires the reviewing court to consider only the Commonwealth's evidence and any evidence presented by the defense that remains uncontradicted when read in the context of the record as a whole. Where the record supports the suppression court's findings of fact, we are bound by those facts and may reverse only where the legal conclusions drawn therefrom are erroneous. *In Interest of A.A.*, 195 A.3d 896, 901

18

(Pa. 2018), *abrogated on other grounds by Commonwealth v. Barr*, 266 A.3d 25 (Pa. 2021).

Prior to conducting an investigative detention, police must have "at least a reasonable suspicion that the person seized is then engaged in unlawful activity." *Reppert*, 814 A.2d at 1203 (citing *Commonwealth v. Polo*, 759 A.2d 372, 375 (Pa. 2000)). As such, we must examine the totality of the circumstances to determine whether a police officer was able to "articulate specific observations[,] which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity." *Reppert*, 814 A.2d at 1204 (citation omitted). In doing so, we are mindful that

> [a]lthough a police officer's knowledge and length of experience weigh heavily in determining whether reasonable suspicion existed, our [c]ourts remain mindful that the officer's judgment is necessarily colored by his or her primary involvement in the often competitive enterprise of ferreting out crime. . . . Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of the [intrusion] warrant a man of reasonable caution in the belief that the action taken was appropriate. . . . This inquiry will not be satisfied by an officer's hunch or unparticularized suspicion.

*Id.* (internal citations, quotation marks, and emphasis omitted).

The Fourth Amendment to the United States Constitution and article I, section 8 of the Pennsylvania Constitution protect individuals from "unreasonable searches and seizures." U.S. Const. amend. IV; Pa. Const. art. I, § 8. While a warrant generally is required for an officer to conduct a search, "[o]ne of the limited exceptions to the warrant requirement is a consensual search." *Commonwealth v. Valdivia*, 195 A.3d 855, 861 (Pa. 2018). In determining the legality of a consensual

19

search, we must employ a two-prong assessment in which we first determine the constitutional validity of a citizen's encounter with police that gave rise to the consent and the voluntariness of that consent. *Commonwealth v. Strickler*, 757 A.2d 884, 888 (Pa. 2000). If the underlying encounter is determined to be lawful, the exclusive focus becomes the voluntariness of the consent. *Id*. at 888-89. However, if the detention violates the Fourth Amendment, then any evidence seized during the stop must be excluded as the fruit of an unlawful detention. *Id*. at 889.

Herein, it is not disputed that Appellant was subjected to a lawful, **initial** traffic stop for moving violations. (R.R. at 126a, 236a.)[16] Thus, with regard to the first prong, we must discern whether Appellant's consent to the search of the SUV after he had been asked to exit the vehicle, was frisked, and was questioned regarding his travel plans, was pursuant to that initial stop from which he was "free to leave" or whether the situation had evolved into an unlawful investigatory detention. *Strickler*, 757 A.2d at 888-89. "[T]he 'free-to-leave' standard presents the central inquiry of whether, considering the totality of the circumstances, the relevant police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Commonwealth v. Cost*, 224 A.3d 641, 650 (Pa. 2020) (citation and quotation marks omitted). "Thus, in the context of a traffic or similar stop, once the purpose for the [initial] stop has been completed, the question arises: Does the individual have objective reasons to believe that he is (or is not) free to end the police/citizen encounter?" *Strickler*, 757 A.2d at 891.

---

[16] Under the Vehicle Code, a police officer has authority to stop a vehicle if he "has reasonable suspicion" that a Vehicle Code violation "is occurring or has occurred" for the purpose of, *inter alia*, "secur[ing] such other information as the officer may reasonably believe to be necessary to enforce the provisions of [the Vehicle Code]." Section 6308(b) of the Vehicle Code, 75 Pa.C.S. § 6308(b).

The suppression court did not enter findings of fact on the record at the conclusion of the suppression hearing or in writing; thus, we must look to the suppression court's opinion for its reasoning. Therein, the suppression court determined that when Trooper asked Appellant to exit his vehicle, the initial traffic stop had not yet concluded. (Dec. Op. at 3 (unnumbered).) In doing so, the suppression court reasoned as follows:

> When [Appellant] exited the vehicle[, Trooper] properly asked him if he had any weapons. [Appellant] said no and he immediately raised his hands above his head. Trooper [] reasonably interpreted this action as a consent to the pat-down. The processing of the traffic stop continued with [Appellant] leaning on the passenger side of the police cruiser while Trooper [] finished processing the paperwork. **We note that Trooper [] received [Appellant]'s paperwork when he was at [Appellant]'s passenger window. He gave the paperwork back to [Appellant]. He got the paperwork back from [Appellant] after [Appellant] was asked to exit the [SUV]**. The question about possession of a weapon and consensual pat-down were reasonably related to officer safety. It was also reasonable under the circumstances to have [Appellant] at the cruiser's passenger side while [] [T]rooper completed the paperwork **from the initial traffic stop**.
>
> Likewise, having had his suspicions raised by [Appellant]'s nervousness, shaking hands, and vague answers seemingly at odds with the rental agreement, it was reasonable for Trooper [] to engage [Appellant] in conversation about the travel plans and their inconsistencies during the processing of the traffic stop.
>
> The totality of the circumstances gave rise to Trooper['s] [] reasonable suspicion that [Appellant] was involved in some criminal activity. This [c]ourt agrees with the Commonwealth's argument that the recent Superior Court opinion in . . . *Galloway* . . . [supports] that Trooper [] was justified in continuing his investigation after completion of the initial traffic stop.
>
> The [c]ourt further finds that [Appellant]'s detention was justified under the totality of the circumstances[.] His agreement to speak to Corporal [] at the . . . barracks after being *Mirandized* and being

21

informed that he was not under arrest and that he was free to leave at any time was knowing and voluntary.

(Dec. Op. at 3-4 (unnumbered) (emphasis added).)

Following our review, we conclude that, despite its own observation that Trooper **received and returned** Appellant's driver's license and paperwork after what the suppression court termed "**the initial traffic stop**" only to retake those items when Trooper asked Appellant to exit the SUV, patted him down, and further questioned him about his travel plans before receiving consent to search the SUV, the suppression court did not follow controlling precedent that an officer's authority to detain a driver during a traffic stop lasts only **as long as is necessary for him to investigate the infraction that provoked the stop, address related safety concerns, and issue a citation or warning**. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015).

Appellant argues that Trooper lacked reasonable suspicion to continue the detention at the roadside once he was assured Appellant's driver's license and rental agreement for the SUV were valid and chose not to issue a warning or citation. To the contrary, the Commonwealth contends that in light of the totality of the circumstances that unfolded at the outset of that encounter, including Appellant's nervous demeanor even after Trooper told him he intended only to issue a warning; the presence of a bag of snacks on the front passenger seat, which suggested to Trooper a lengthy trip; the one-way rental agreement for the SUV; and Appellant's volunteering information about his travels, created reasonable suspicion for Trooper to continue his investigation. The Superior Court was faced with a similar question and arguments in *Commonwealth v. Mattis*, 252 A.3d 650 (Pa. Super. 2021), wherein the Court held a police officer's directing a driver to exit the vehicle once the officer's authority for the original stop had expired initiated a new, investigative

22

detention that required independent reasonable suspicion of illegal activity. 252 A.3d at 656. In *Mattis*, the trooper testified at the suppression hearing that he stopped the appellant's vehicle for speeding, at which time he observed the appellant was "extraordinarily nervous," "seemed to be fidgeting around a lot inside the vehicle[,]" and would not "look [him] in the eye constantly[.]" *Id*. at 655-56. As the trooper checked the appellant's driver's license and vehicle registration to confirm there were no active warrants for the appellant's arrest, the trooper remarked that the appellant was "continually nervous" and asked him to exit the vehicle and move to its rear. *Id*. at 656. At that time, the trooper asked the appellant if he had any contraband in the vehicle and asked for consent to search it. When the appellant consented to the search, the trooper had not yet returned his driver's license and vehicle registration, and admitted that at that time, the appellant was not free to leave. *Id*. at 656. In vacating the trial court's denial of the appellant's suppression motion, the Superior Court stated the following:

> "Where the purpose of an initial, valid traffic stop has ended and a reasonable person would have believed that he was free to leave, the law characterizes a subsequent round of questioning by the officer as a mere encounter." *Commonwealth v. By*, 812 A.2d 1250, 1255 (Pa. Super. 2002), *appeal denied*, . . . 839 A.2d 350 ([Pa.] 2003). Since the citizen is free to leave, he is not detained, and the police are free to ask questions appropriate to a mere encounter, including a request for permission to search the vehicle. *See Commonwealth v. Freeman*, . . . 757 A.2d 903, 907 ([Pa.] 2000). Nevertheless, where the purpose of an initial traffic stop has ended and a reasonable person would not have believed that he was free to leave, the law characterizes a subsequent round of questioning by the police as an investigative detention or arrest. *Id.* . . . In the absence of either reasonable suspicion to support the investigative detention or probable cause to support the arrest, the citizen is considered unlawfully detained. *See Strickler*, . . . 757 A.2d at 889. Where a consensual search has been preceded by an unlawful detention, the exclusionary rule requires suppression of the evidence. *Id.*

Our Supreme Court has expressly recognized that an officer conducting a valid traffic stop may order the occupants of a vehicle to alight to assure his own safety. *See Freeman*, . . . 757 A.2d at 907 (citing *Pennsylvania v. Mimms*, 434 U.S. 106 . . . (1977)[,] and *Maryland v. Wilson*, 519 U.S. 408 . . . (1997)). Once the primary traffic stop has concluded, however, the officer's authority to order either the driver or occupant from the car is extinguished. *Commonwealth v. Sierra*, . . . 723 A.2d 644 ([Pa.] 1999) (plurality). Thus, if the officer directs or requests the occupants to exit the vehicle after resolution of the reason for the initial stop, the officer's show of authority may constitute an investigatory detention subject to a renewed showing of reasonable suspicion. *See Commonwealth v. Donaldson*, 786 A.2d 279 (Pa. Super. 2001) (concluding that officer's "request" for driver to exit vehicle following conclusion of initial traffic stop could not be viewed as discretionary and constituted investigatory detention). Significantly, absent more, a police officer's assessment that the occupants of a vehicle appear nervous does not provide reasonable suspicion for an investigative detention. *Commonwealth v. DeHart*, 745 A.2d 633 (Pa. Super. 2000).

. . . .

Under these circumstances, we cannot agree with the suppression court's decision that [the a]ppellant's consent was lawful. The trooper testified that he asked [the a]ppellant to exit his vehicle in an attempt to discover the cause of [the a]ppellant's nervous behavior. The trooper did not make this request in furtherance of his investigation for the speeding violation. Rather, the trooper sought to obtain additional information unrelated to the initial traffic stop. Significantly, once the primary purpose of the initial stop for the speeding violation ended, the trooper's authority to order [the a]ppellant to exit his car had extinguished. *See Sierra*, *supra*. Thus, the trooper's request for Appellant to exit his vehicle constituted an investigatory detention, requiring reasonable suspicion. *See Donaldson*, *supra*. [The a]ppellant's nervous behavior alone did not provide a sufficient basis to warrant an investigatory detention. *See DeHart*, *supra*. Further, the trooper acknowledged that once [the a]ppellant exited his vehicle, he was not free to leave. The fact that the trooper retained possession of [the a]ppellant's driver's license and registration during each request for consent confirms that [the a]ppellant was actually not free to leave. *See Freeman, supra.* Therefore, [the a]ppellant's consent to search was

24

not constitutionally valid on these facts. *See Lopez*, *supra*.

*Mattis*, 252 A.3d at 655-56 (citations to notes of testimony omitted).

Similarly, in *Commonwealth v. Ochoa*, 304 A.3d 390 (Pa. Super. 2023), the Superior Court rejected the trial court's conclusion that the appellant was free to leave after he had been pulled over on suspicion that he was driving under the influence of alcohol or controlled substances (DUI) where the trooper retained his driver's license and continued to question him after he passed field sobriety tests. The Superior Court found that by continuing to question the appellant, the police officers had subjected him to a "second investigatory detention which was not supported by reasonable suspicion of any activity other than the previously[ ]resolved suspicion of DUI." *Id.* at 400. The Superior Court further observed that because the police had retained the appellant's driver's license, they created "a legal impediment to [the a]ppellant's ability to leave the scene of the traffic stop" because "if [the a]ppellant had driven away from the stop while the police held onto his driver's license, [the a]ppellant would be violating traffic laws. *See* 75 Pa.C.S. § 1511(a) ('Every licensee shall possess a driver's license issued to the licensee at all times when driving a motor vehicle[.]')." *Id.* at 399. The Superior Court stressed the appellant's inability to leave the scene was "particularly relevant" in that police stopped the appellant on a rural road on a "frigid night" when he could not easily leave on foot as he was being questioned. *Id*. at 399-400. Thus, because police continued to question the appellant after he passed the field sobriety tests, the Superior Court held the appellant had been subject to a second investigatory detention unsupported "by reasonable suspicion of any criminal activity other than the previously resolved suspicion of DUI [and a]bsent reasonable suspicion, this investigatory detention was unlawful, and [the a]ppellant's consent was invalid." *Id.*

25

at 400. As a result, the Superior Court found that all evidence derived from the search of the appellant's vehicle, along with his statements, "should have been suppressed." *Id*.

Likewise, in *Lopez*, police stopped the appellant who had been driving a rented Ryder truck towing an automobile for a traffic violation. Without first returning the appellant's registration, rental agreement, and driver's license, police continued to question the appellant regarding his travel plans and asked for his consent to search the vehicles, at which time 76 pounds of marijuana was discovered in the car. The Superior Court determined this "continued detention and investigation" constituted an unreasonable seizure under the Fourth Amendment. *Lopez*, 609 A.2d at 182. In finding the evidence should have been suppressed as "the fruit of an illegality[,]" the Superior Court held the police had illegally seized the appellant when he retained the appellant's driver's license and vehicle paperwork, because without those documents, the appellant was not free to leave and could not legally do so without his driver's license. *Id*. at 182.

Following our review of the Commonwealth's evidence herein, we agree with the suppression court that the record supports Trooper's probable cause to conduct the initial stop of the SUV for violations of the Vehicle Code based on his observations of Appellant's speed fluctuations, following too closely, and failure to use a turn signal. Accordingly, we conclude that the initial traffic stop did not violate federal or state constitutional protections. However, mindful of the foregoing legal principles, we hold that the suppression court erred when it determined that "[t]he facts show that the initial traffic stop had not been concluded when Trooper [] asked [Appellant] to exit the vehicle." (Dec. Op. at 3 (unnumbered).) In particular, we reject the suppression court's conclusion, without elaboration, that "[t]he totality of

26

the circumstances gave rise to Trooper['s] [] reasonable suspicion that [Appellant] was involved in some criminal activity." (*Id.* at 4 (unnumbered).)

The transcript of the MVR reveals that upon initially speaking to Appellant, Trooper told him that "[t]he only reason why I stopped you for is [sic], number one, make sure you use turn signals" after which he added that Appellant has "got to slow it down" and "make sure [he] back[s] off those trucks[.]" (R.R. at 251a-52a.) At this point, Trooper asked Appellant for his driver's license and paperwork for the SUV and told him that "[a]s long as everything is good, [he will] consider giving [Appellant] a warning." (*Id.* at 252a.) Of course, Trooper was free to make additional inquiries in this regard which may "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance [as] [t]hese checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*, 575 U.S. at 355 (citations omitted). Instead, Trooper, who had approached the SUV from the passenger side with a full view of its interior, commented on the bag of snacks on the front passenger seat and asked Appellant if they were "snacks or what?" (*Id.* at 253a.) When Appellant indicated that he had been in New York to visit his parents and was on his way to see his friend for the Chinese New Year, Trooper immediately asked Appellant to exit the SUV, stopped on the side of I-80 in the "cold" and "freezing" temperatures with snow covering the ground, and accompany him back to the police cruiser where he was frisked and no contraband was found on his person. (*Id.* at 179a-80a, 188a, 253a.) Significantly, Trooper admitted Appellant was not free to leave when he was asked to exit the SUV and proceed to the patrol car. (*Id.* at 184a-85a.) Trooper also admitted that he never feared for his own safety

27

and characterized Appellant's demeanor as "cordial" and "friendly." (*Id.* at 132a-33a, 181a.) Moreover, as counsel acknowledged during oral argument, Trooper even permitted Appellant to scroll through his phone as he stood on the roadside, which speaks to the non-threatening nature of Appellant's presence. Trooper also acknowledged that once he pulled over Appellant, he had all the information needed to "write a citation or issue a warning in terms of the conduct that form[ed] the basis for this stop" for he had already observed the moving violations. (*Id.* at 166a.)

Thus, Trooper's direction for Appellant to exit the SUV, at which time he retook possession of Appellant's driver's license and SUV paperwork, marked a turning point in the interaction which escalated into a second investigative detention. *See Mattis.* The record simply does not evince that the circumstances leading to Trooper's request for Appellant to exit the SUV, pat down, and subsequent consent to search the SUV were supported by reasonable suspicion of criminal activity or based on anything more than a "hunch" or "unparticularized suspicion." *Reppert*, 814 A.2d at 1204. Prior to doing so, Trooper noted only that he had perceived Appellant's "overly nervous hand shaking" demeanor, his "trembling" lips and face, the snacks as evidence of "long, hard travel," and Appellant's "uncommon" voluntary offering of information regarding his travel as evidence of a cover story. (R.R. at 131a-34a, 178a, 184a-85a.) The subsequent round of 65 questions, while Appellant stood outside the patrol car in the cold on the side of I-80, was part of a situation in which Trooper admitted that "no reasonable person" would have felt free to leave when the police had taken possession of their driver's license, rental agreement, currency, and phone, which was confirmed by Corporal Conrad telling Appellant he "need[ed]" or "ha[d] to follow" them back to the barracks. (*Id*. at 190a, 194a, 204a-05a, 274a, 276a.) Appellant's ultimate consent to search the SUV,

28

Trooper's seizure of the currency and phone as a result of that search, Appellant's hours-long interrogation at the barracks, and Appellant's execution of the Form, were part of that second, investigative detention conducted without the necessary reasonable suspicion that Appellant was involved in criminal activity. *See Freeman*, 757 A.2d at 907. In this way, we are not persuaded by the suppression court's reliance on *Galloway*.

In *Galloway*, the appellee was the front-seat passenger in a vehicle stopped as part of a holiday evening enforcement unit for traveling over the speed limit. 265 A.3d at 812, 816. The police officer informed the driver he had planned to issue him a warning and permit him to leave. The appellee did not have identification, was nervous, "sweating profusely," failed to make eye contact with the officer, kept "his head down," sat "closed[] away" from the officer, and "allowed the ash from [a] cigarette he was smoking to fall on his lap[] instead of out the window." *Id.* at 816. The officer found the appellee's profuse sweating to be suspicious, as it was a cold evening, and unusual as the appellee was not "in trouble for anything." *Id*. at 816-17. The driver also appeared extremely nervous and had difficulty handing over his paperwork due to his trembling hand. *Id*. Although the driver's documentation did not reveal any outstanding warrants, the police officer learned the appellee's driver's license had been suspended and he had a "lengthy criminal history involving drug dealing." *Id.* Acknowledging that, pursuant to *Rodriguez*, at that juncture the officer had accomplished the "seizure's mission" to address the traffic violation, which was the reason for the initial stop, the *Galloway* Court concluded that the "interaction seamlessly transitioned into a second, investigative detention" wherein the officer asked additional questions of the appellee connected to his reasonable suspicion that criminal activity was afoot. *Id*. When he asked the appellee to exit the vehicle, he

29

noticed a marijuana bowl in plain view and proceeded to conduct a vehicle search, which revealed more drugs. The officer then arrested the two occupants and read them their *Miranda* warnings. *Id*. at 812.

Herein, when Trooper asked Appellant to exit his vehicle and patted him down, Trooper already had discovered Appellant's driver's license was valid and he had no criminal history. Although Appellant may have appeared very nervous and his manner of driving, bag of snacks, and rental agreement may have raised Trooper's suspicions initially, Trooper neither observed nor smelled any drugs or alcohol, or discovered any other contraband in plain view, during the initial traffic stop. When Trooper returned Appellant's driver's license and SUV paperwork to him the first time, the purpose of the initial traffic stop was complete, and Trooper required reasonable suspicion of a crime unrelated to the initial traffic stop to detain Appellant further. *Freeman*, 757 A.2d at 907. Thus, we hold Appellant's interaction with Trooper transitioned into a second, unlawful investigative detention, and Appellant's consent to search during that second detention was not constitutionally sound.

"[G]enerally speaking, the exclusionary rule applies to evidence that was obtained from a search or seizure in violation of the Fourth Amendment. The fruit of the poisonous tree doctrine[17] extends the exclusionary rule to render evidence inadmissible which was derived from the initially illegally obtained evidence." *Commonwealth v. Santiago*, 209 A.3d 912, 916 n.4 (Pa. 2019). Because he was being subjected to an illegal detention when he consented to Trooper's search of the

---

[17] The "fruit of the poisonous tree" doctrine prohibits the admission of evidence in a trial where that evidence "was tainted by unconstitutional actions by law enforcement officials." *Commonwealth v. Santiago*, 209 A.3d 912, 914 (Pa. 2019).

SUV, the currency and phone seized from that search in violation of the Fourth Amendment are rendered inadmissible under the exclusionary rule as the product of the fruit of the poisonous tree doctrine, and we reverse the suppression court's Order of December 20, 2021. *Id*. Although no criminal charges were brought against Appellant, this holding is potentially dispositive of the Commonwealth's Forfeiture Motion and Appellant's Return of Property Action, for where, as herein, an appellant challenges both an order denying suppression and an order granting forfeiture of his property in an appeal from a final order, "the appellate court's disposition of the suppression issue will likely affect what evidence the appellate court may consider in connection with the forfeiture issue." *Commonwealth v. Bowers*, 185 A.3d 358, 363 (Pa. Super. 2018) (footnote omitted).

### B. *Forfeiture Motion and Return of Property Action*

Appellant was neither charged with nor convicted of a crime in connection with the events of January 23, 2020. The Pennsylvania Supreme Court has stated that because a forfeiture action is a collateral civil proceeding for a return of property, "for property to be deemed forfeitable, neither a criminal prosecution nor a conviction is required." *Commonwealth v. $6,425.00 Seized From Esquilin*, 880 A.2d 523, 530 (Pa. 2005) (citing *Commonwealth v. $11,600.00 Cash, U.S. Currency*, 858 A.2d 160, 167 (Pa. Cmwlth. 2004)). For this reason, "the progress of an ancillary criminal proceeding, if any, may not be relevant because conviction of a crime is not necessary to support forfeiture proceedings[.]" *Commonwealth v. Allen*, 59 A.3d 677, 679-80 (Pa. Cmwlth. 2012) (citation and internal quotation marks omitted). Therefore, "there may be a civil forfeiture proceeding where no criminal

31

charges have even been filed against the person from whom the property has been seized." *Id.* at 680.

Appellant's Suppression Motion and Return of Property Action and the Commonwealth's Forfeiture Motion are inextricably linked. This Court has determined that the Commonwealth cannot use evidence in a forfeiture proceeding that has been suppressed in criminal proceedings. *Commonwealth v. Jackson*, 53 A.3d 952, 958 (Pa. Cmwlth. 2012). In addition,

> [i]t is well settled that the Commonwealth may not permanently acquire derivative contraband which it has initially seized unconstitutionally. Because of the underlying penal purpose of the forfeiture proceedings, the United States Supreme Court had long ago determined that the remedy for violations of the Fourth Amendment, the exclusionary rule, extends to forfeiture proceedings.

*Commonwealth v. McJett*, 811 A.2d 104, 108 n. 5 (Pa. Cmwlth. 2002) (citations omitted). Thus, "[o]nly where the government has independent, unsuppressed evidence that the res is contraband is it entitled to proceed on the merits in a forfeiture case." *Commonwealth v. $26,556.00 Seized From Polidoro*, 672 A.2d 389, 392 (Pa. Cmwlth. 1996).

*Jackson*, 53 A.3d at 957-58. Also, a claimant's return of property is a "mirror image" of a forfeiture motion under the Forfeiture Act. *In re One 1988 Toyota Corolla*, 675 A.2d 1290, 1295 (Pa. Cmwlth. 1996).

Clearly, if the suppression court had determined that Appellant's consent to search the SUV was given during an unlawful second detention, as this Court has held herein, it would have followed that Appellant's consent, which lead to the discovery of the currency and seizure of the currency and phone, was tainted by that illegality, and those items were the fruit of the poisonous tree. Under these

circumstances, there would have been no items for which the Commonwealth could seek forfeiture, Appellant would have had no need to bring the Return of Property Action, and the trial court's April 29, 2022 Order would not have been entered. Thus, in light of our reversal of the suppression court's Order of December 20, 2021, we reverse the trial court's order entered on April 29, 2022, granting the Forfeiture Motion and denying Appellant's Return of Property Action. However, to the extent the Commonwealth contends that the Form evinces Appellant's voluntary consent to the forfeiture of the currency and phone, we will consider the viability of that argument for completeness.

The Forfeiture Act authorizes forfeiture of any property that has been used to facilitate a drug offense. Pursuant to Section 5802(6)(i)(B) of the Forfeiture Act, certain items "shall be subject to forfeiture to the Commonwealth and no property right shall exist in them" including "[m]oney . . . or other things of value used or intended to be used to facilitate any violation of . . . [the] Drug . . . Act[.]" 42 Pa.C.S. § 5802(6)(i)(B). This Court has determined that because "the law generally disfavors forfeitures," the Forfeiture Act must "be strictly construed[.]" *Commonwealth v. $301,360.00 U.S. Currency*, 182 A.3d 1091, 1097 (Pa. Cmwlth. 2018) (en banc) (quotation marks omitted). In addition, the Forfeiture Act sets forth the procedure one must follow to seek the return of property, stating "[a] person aggrieved by a search and seizure may move for the return of the property seized by filing a motion in the court of common pleas in the judicial district where the property is located." 42 Pa.C.S. § 5806(a)(1).

In a forfeiture proceeding, the Commonwealth bears the initial burden of demonstrating, "by a preponderance of the evidence, that a nexus exists between the [seized property] and a violation of the [Drug] Act." *Esquilin*, 880 A.2d at 529. "A

33

preponderance of the evidence is tantamount to a 'more likely than not' standard." *Id*. (citation omitted). The Commonwealth may satisfy its burden by circumstantial evidence, but it must show "more than the possibility or a mere suspicion of a nexus." *$301,360.00 U.S. Currency*, 182 A.3d at 1097. If the Commonwealth establishes a substantial nexus, then the burden shifts to the claimant to prove that he or she owns the property, lawfully acquired the property, and did not unlawfully use or possess it. *Id*.

We first address whether the Commonwealth's evidence upon which the trial court relied satisfied its burden of demonstrating a substantial nexus between the seized currency and phone and illegal drug activity in violation of the Drug Act. At the April 25, 2022 hearing, the Commonwealth presented only one exhibit, the Form, and Trooper's testimony pertaining to the same. Trooper testified that he did not review each of the six provisions of the Form with Appellant prior to Appellant initialing them. Instead, Trooper only generally explained the contents of the Form to Appellant and stated he did so because Appellant appeared to be "distancing himself from the money saying that it wasn't his, it was his friend[']s." (R.R. at 329a-30a.) Neither in its Order denying the Forfeiture Action nor in its Rule 1925(a) Opinion did the trial court mention the phone, and, without elaboration in its Rule 1925(a) Opinion, states simply that "[u]nder the terms of the [Form], [Appellant] agreed the money involved was derivative of contraband and admitted the nexus between the money and illegal drug activity." (Rule 1925(a) Op. at 6.)

The evidence the Commonwealth presented is devoid of anything to show that Trooper discovered drugs or drug paraphernalia in the SUV or that any criminal charges have been filed in relation to the currency or phone. This Court had observed that such facts are probative of a finding as to whether seized items are

34

contraband and that their absence makes it difficult to establish a nexus even where other indicators are present, including signed disclaimer forms which police officers explained to the signers. *$301,360.00 U.S. Currency*, 182 A.3d at 1094, 1096 n.8, 1101-02. When asked what conclusions he was able to draw pertaining to the currency based upon his training and experience, Trooper offered only that "[t]ypically, when - most likely [Appellant] would not be able to prove where this money came from since he lied to me about it and said that he did not want to fly with it." (R.R. at 322a.) However, "inconsistent stories about [a] trip" do not establish a link between seized money and illegal drug activity, where the occupants in a vehicle were under no obligation to provide an explanation for their travels. *$301,360.00 U.S. Currency*, 182 A.3d at 1103. Also, even if the Commonwealth had sought to admit ion scan evidence on April 25, 2022, which it did not, such evidence is not necessarily admissible as relevant, nor does it automatically demonstrate a substantial nexus. *Id*. at 1098-99. Trooper himself admitted "[i]t's not illegal to possess money," (R.R. at 188a), and that the currency was seized prior to the ion scan or the K9 alerting to it, (*id.* at 202a).

The trial court primarily relies upon *Smith* and the Superior Court's decision in *Commonwealth v. Kerns*, 220 A.3d 607, 612-13 (Pa. Super. 2019), for the proposition that consent forfeiture agreements must be viewed under principles of contract law and are analogous to plea agreements, which the trial court may accept or reject. According to the trial court, the Form, as a contract, was supported by valid consideration because Appellant severed any ties he may have had to the money, and he would not be involved in a forfeiture proceeding. (Rule 1925(a) Op. at 7.) However, the trial court's reliance on these cases is misplaced. In *Smith*, the Commonwealth sought the enforcement of an oral, proposed consent asset forfeiture

35

order as part of the terms of a negotiated plea agreement following the appellant's guilty plea to two drug charges. 757 A.2d at 356. The trial court refused to enforce the proposed consent forfeiture order upon finding that the Commonwealth had attempted to seize certain funds without first providing the appellant with due process, and the Commonwealth appealed. *Id*. The Superior Court reversed, and the Supreme Court affirmed the Superior Court, finding that the trial court had abused its discretion in rejecting the consent forfeiture on the basis of the Commonwealth's failure to file a written forfeiture petition. *Id*. at 357. Notwithstanding its findings that the situation presented was "analogous to a matter involving a plea agreement[;]" a trial court may "refuse to accept a plea of guilty or nolo contendere[;]" and a trial court also "has discretion to reject or accept a [] forfeiture agreement[,]" the Supreme Court noted the trial court's discretion is reviewable for an abuse of discretion. *Id*. (citation omitted). Similarly, in *Kerns*, the Superior Court observed that although plea agreements arise in a criminal context, they must be analyzed under principles of contract law as they are contractual in nature. 220 A.3d at 612.

The instant matter did not arise in a criminal context, but rather, it is a civil forfeiture proceeding. Also, Appellant did not sign the Form or otherwise agree to forfeit the currency and phone as a material part of a plea agreement. To the contrary, the record does not show that Appellant has been charged with any crimes in connection with the seizure of those items, and he has consistently maintained that he did not freely and knowingly sign the Form divesting himself of his right to retain those items. Moreover, if we were to analogize the Form "to a written confession or open guilty plea" as the Commonwealth urges, (Commonwealth's Br. at 41), its position, ironically, would be weakened, for a guilty plea requires both a

36

writing and an on the record colloquy before the trial court to show it was knowingly, voluntarily, and intelligently entered.  As this Court has explained:

> To begin, the Pennsylvania Rules of Criminal Procedure require a guilty plea to be offered in open court and a colloquy conducted to ensure that the plea is voluntary and understood by the defendant. P[a].R.C[rim].P. 590(A).[]  At a minimum, a plea colloquy should inquire into six areas:  "1) the nature of the charges, 2) the factual basis of the plea, 3) the right to a jury trial, 4) the presumption of innocence, 5) the sentencing ranges, and 6) the plea court's power to deviate from any recommended sentence." *Commonwealth v. Reid*, 117 A.3d 777, 782 (Pa. Super. 2015) (quotations omitted).  *See also* P[a].R.C[rim].P. 590, Comment.  "[A] written plea colloquy that is read, completed and signed by the defendant and made part of the record may serve as the defendant's plea colloquy when supplemented by an *oral, on-the-record examination*." *Reid*, 117 A.3d at 782-83 (emphasis added).

*In re 4714 Morann Ave., Houtzdale, Clearfield Cnty.*, 303 A.3d 200, 214 (Pa. Cmwlth. 2023) (footnote omitted).

Appellant did not complete the Form in the presence of the trial court. Although Trooper testified that he generally explained the nature of the Form to Appellant, Trooper admittedly did not discuss with Appellant each of the provisions relating to the important rights Appellant was about to relinquish, including Appellant's right to a jury trial and to present a defense at a forfeiture hearing.  (R.R. at 329a-30a, 342a-43a.)  In fact, Trooper did not definitively testify that Appellant even read the Form but only surmised that because "[Appellant's] eyes were going back and forth" that "he appeared to be reading."  (*Id.* at 324a-25a.)  Even if Appellant did read the entire Form, there is no evidence that he comprehended what he was reading.  Appellant's lack of a full understanding of the Form's contents is evidenced by the fact that the phone was not listed on the Form among the seized property, yet Appellant did not ask for its return after he signed the Form.  Also, if

37

Appellant knowingly and voluntarily forfeited any claim to the currency and understood that doing so severed him from any connection he otherwise may have had to it, as the trial court found, he unlikely would have experienced a sleepless night and the dizziness and worry he expressed to Trooper regarding possible tax ramifications. (*Id.* at 328a.)

The Pennsylvania Supreme Court has explained that "[t]he classic definition of a valid waiver is 'the intentional relinquishment of a known right,' *see Johnson v. Zerbst*, 304 U.S. 458, 464 . . . (1938), and th[e] Court has applied that standard to waivers of rights of non-constitutional dimension. *See Commonwealth v. Johnson*, . . . 413 A.2d 1047, 1049-50 ([Pa.] 1980)[.]" *Commonwealth v. Gribble*, 863 A.2d 455, 473 (Pa. 2004). This Court has found that "[a] waiver is knowing and intelligent if the right holder is aware of both the nature of the right and the risk of forfeiting it." *Pa. Liquor Control Bd. v. Beh*, 215 A.3d 1046, 1056 (Pa. Cmwlth. 2019) (citation omitted). Thus, if we were to deem the Form to be the functional equivalent of a guilty plea, the admitted lack of guidance offered to Appellant as he read and executed it, and the complete absence of an oral colloquy, would render it unknowingly and involuntarily entered. *In re 4714 Morann Ave*. Because the Commonwealth has not met its burden of proof, our analysis ends, and we need not consider whether Appellant has shown he is an owner who is entitled to return of the property. *$301,360.00 U.S. Currency*, 182 A.3d at 1097.

## V. CONCLUSION

Following our review, we find that when Trooper directed Appellant to exit the SUV, patted him down, and peppered him with questions pertaining to his travel plans, his investigation of the initial traffic stop had ceased, and a second

investigative detention unsupported by reasonable suspicion had begun. Trooper's search of the SUV and seizure of the currency and phone occurred as part of this unlawful detention, and, therefore, this evidence should have been suppressed. We further find that the record is simply devoid of any evidence that shows a substantial nexus between the seized currency and phone and the facilitation of a drug offense. The Commonwealth presented no evidence as to the connection between the phone and a drug offense at the April 25, 2022 hearing, and the trial Court's subsequent Order on the Forfeiture Motion makes no mention of the phone. With regard to the currency, the Commonwealth's only witness, Trooper, testified that Appellant's travel plans seemed implausible and that Appellant initially lied to him about it. The trial court relied entirely on the Form, the only exhibit the Commonwealth entered into evidence, in support of its determination that the Commonwealth met the formal requirements of the Forfeiture Act. Accordingly, we reverse.

_____

**RENÉE COHN JUBELIRER,** President Judge

39

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re:  $300,000 in U.S. Currency | : | CASES CONSOLIDATED |
| | : | |
| | : | |
| Appeal of:  Zhi Xiong Xu | : | No.  520 C.D. 2022 |
| | | |
| In re:  $300,010 in U.S. Currency | : | |
| | : | |
| | : | No.  521 C.D. 2022 |
| Appeal of:  Zhi Xiong Xu | : | |

## **O R D E R**

**NOW**, February 1, 2024, the December 20, 2021 Order and the April 29, 2022 Order of the Court of Common Pleas of Union County, entered in the above-captioned matters, are **REVERSED**.  The matter is remanded for the return of the currency and phone to Appellant Zhi Xiong Xu.

Jurisdiction relinquished.

_____
**RENÉE COHN JUBELIRER,** President Judge